1  Robert C. Moest, Of Counsel, SBN 62166
2  **THE BROWN LAW FIRM, P.C.**
   2530 Wilshire Boulevard, Second Floor
3  Santa Monica, CA 90403
   Telephone: (310) 915-6628
4  Facsimile: (310) 915-9897
   Email: RMoest@aol.com

5  *Counsel for Plaintiff*

6  [Additional Counsel on Signature Page]

7              **UNITED STATES DISTRICT COURT**
8              **NORTHERN DISTRICT OF CALIFORNIA**

9

10  MARIE CHAPPEL, derivatively on
    behalf of OUTSET MEDICAL, INC.,        Case No.:
11
                      Plaintiff,
12                                          DEMAND FOR JURY TRIAL
13      v.
14                                          **VERIFIED SHAREHOLDER**
    LESLIE TRIGG, NABEEL AHMED,             **DERIVATIVE COMPLAINT**
15  REBECCA CHAMBERS, KAREN
    DREXLER, D. KEITH GROSSMAN,
16  PATRICK T. HACKETT, JIM
    HINRICHS, DALE E. JONES,
17  ANDREA L. SAIA, and CATHERINE
    SZYMAN,
18
                      Defendants,
19
20      and
21
    OUTSET MEDICAL, INC.,
22
23                    Nominal Defendant.
24
25
26
27
28
                Verified Shareholder Derivative Complaint

# INTRODUCTION

Plaintiff Marie Chappel ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Outset Medical, Inc. ("Outset" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Leslie Trigg ("Trigg"), Nabeel Ahmed ("Ahmed"), Rebecca Chambers ("Chambers"), Karen Drexler ("Drexler"), D. Keith Grossman ("Grossman"), Patrick T. Hackett ("Hackett"), Jim Hinrichs ("Hinrichs"), Dale E. Jones ("Jones"), Andrea L. Saia ("Saia"), and Catherine Szyman ("Szyman"), (collectively, the "Individual Defendants," and together with Outset, ("Defendants") for breaches of their fiduciary duties as directors and/or officers of Outset, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Trigg, Ahmed, and Chambers for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Outset, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

# NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the directors and/or officers of Outset from September 15, 2020 through August 7, 2024, both dates inclusive (the "Relevant Period").

2. Outset is a medical technology company incorporated in Delaware with headquarters located in California. The Company's primary products are devices used in kidney dialysis, the primary treatment for acute and chronic kidney failure. Outset's flagship product is the Tablo Hemodialysis System ("Tablo"). Tablo is a dialysis machine that requires only an electrical outlet and tap water to operate. Tablo purifies tap water and then artificially purifies and removes toxins from the blood of patients suffering from kidney failure. In October 2022, the Company introduced the TabloCart with Prefiltration ("TabloCart") as an accessory for the Tablo, which was purportedly intended to provide additional maneuverability and pre-filtration capabilities for poor water qualities.

3. Tablo has been cleared by the U.S. Food and Drug Administration ("FDA) for use in the hospital, clinic, or home setting but, notably, has not been cleared for Continuous Renal Replacement Therapy ("CRRT"), wherein solute removal and fluid balance is managed continuously over 24 hours in a hospital.

4. During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) for market authorization of TabloCart, the Company was required to receive prior 510(k) clearance; (2) Outset had not obtained the required FDA clearance to market and sell the TabloCart; (3) based on the foregoing, the Company would be forced to stop shipment of the TabloCart; (4) the Company had falsely promoted CRRT as a modality within the FDA-approved indications for the Tablo, when in reality it had not been approved for this purpose; (5) the Company lacked the sales team and process to execute on the ramp of Tablo sales; (6) Outset's internal controls were inadequate and led to, *inter alia*, the improper marketing of Tablo and TabloCart; (7) the Company's reports and financial statements did not fairly present in all material respects: (a) Outset's

financial condition, including its reliance on improper marketing, and (b) the fact that the Company's revenue and growth reported therein was the result of undisclosed, illicit, and unsustainable improper marketing; and (8) due to the foregoing, Outset's revenue growth would be adversely impacted. As a result of the foregoing, Outset's public statements were materially false and misleading at all relevant times.

5.    The truth began to emerge on July 7, 2023 when, after market hours, the Company filed a Form 8-K with the SEC revealing that it had received a Warning Letter from the FDA, which "assert[ed] that certain materials . . . on the Company's website promote continuous renal replacement therapy (CRRT), a modality outside of the current indications for the Tablo® Hemodialysis System" and further asserted that TabloCart "requires prior 510(k) clearance for marketing authorization."

6.    On this news, the price per share of the Company's common stock fell $1.20, or 5.9%, from a closing price of $20.46 on July 7, 2023 to close at $19.26 per share on July 10, 2023.

7.    Subsequently, on August 2, 2023, after market hours, Outset announced that it had paused the shipment of TabloCart pending the FDA's 510(k) clearance.

8.    On this news, the price per share of the Company's common stock fell $1.97, or 10.2%, from a closing price of $19.36 on August 2, 2023 to close at $17.39 per share on August 3, 2023.

9.    On October 12, 2023, after market hours, Outset revealed that its revenue growth had been severely affected by the FDA's warning letter. Specifically, Outset issued a press release announcing preliminary third quarter 2023 financial results, as well as updated financial guidance for 2023 revenue, which reflected that "[g]rowth in the quarter was dampened by a larger-than-expected impact in the field from the recent FDA warning letter."

10.    On this news, the price per share of the Company's common stock fell $3.38, or 49.9%, from a closing price of $6.77 per share on October 12, 2023 to close at $3.39 per

share on October 13, 2023.

11.    The truth fully emerged on August 7, 2024, after market hours, when the Company released its financial results for the second quarter of the fiscal year ended December 31, 2024 ("2024 Fiscal Year"), significantly missing consensus estimates and lowering its full 2024 Fiscal Year revenue guidance by $39 million at the midpoint.  In discussing these results, Outset revealed it would be forced to "take clear steps to improve our execution," including "sales team and process restructuring."  As a result, the Company revealed it would be unable to deliver on a post-approval sales ramp of TabloCart previously forecast.

12.    On this news, the price per share of the Company's common stock fell $2.33, or 68.53%, from a closing price of $3.40 per share on August 7, 2024 to close at $1.07 per share on August 8, 2024.

13.    During the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact while four of the Individual Defendants engaged in insider trading while the Company's stock was artificially inflated from the Individual Defendants' false and misleading statements, netting combined total proceeds of over $35.6 million.

14.    In light of the Individual Defendants' misconduct—which has subjected the Company, its President/Chief Executive Officer ("CEO")/Chairman of its Board of Directors (the "Board"), its Chief Financial Officer ("CFO"), and its former CFO, to two federal securities fraud class action lawsuits pending in the United States District Court for the Northern District of California (the "Securities Class Actions"), and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged

herein—the Company will have to expend many millions of dollars.

15.    The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

16.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action and of certain directors' and officers' liability in the Securities Class Actions, and of their not being disinterested and/or independent directors, a majority of the Company's Board cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

17.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)(1)), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)) and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

18.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

20.    Venue is proper in this District because Outset's principal executive offices are in this District. In addition, a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

21.     Plaintiff is a current shareholder of Outset. Plaintiff has continuously held Outset common stock at all relevant times.

**Nominal Defendant Outset**

22.     Outset is a Delaware corporation with principal executive offices at 3052 Orchard Drive, San Jose, California 95134. Outset's common stock trades on the Nasdaq Stock Market LLC (the "NASDAQ") under the ticker symbol "OM."

**Defendant Trigg**

23.     Defendant Trigg has served as the Company's President, CEO, and as a Company director since November 2014 and as Chair of the Board since February 2022. According to the Schedule 14A the Company filed with the SEC on April 11, 2024 (the "2024 Proxy Statement"), as of March 6, 2024, Defendant Trigg beneficially owned 1,053,324 shares of the Company's common stock, constituting approximately 2% of the Company's total outstanding common stock. Given that the price per share of the Company's common stock at the close of trading on March 6, 2024 was $2.80, Defendant Trigg owned approximately $2.9 million worth of Outset stock as of that date.

24.     For the fiscal year ended December 31, 2023 (the "2023 Fiscal Year"), Defendant Trigg received $6,474,946 in total compensation from the Company. This included $723,077 in salary, $5,254,876 in stock awards, $489,876 in non-equity incentive plan compensation, and $7,117 in all other compensation. For the fiscal year ended December 31, 2022 (the "2022 Fiscal Year"), Defendant Trigg received $4,128,283 in total compensation from the Company. This included $661,125 in salary, $2,904,800 in stock awards, $555,761 in non-equity incentive plan compensation, and $6,597 in all other compensation. For the fiscal year ended December 31, 2021 (the "2021 Fiscal Year"), Defendant Trigg received $7,138,281 in total compensation from the Company. This included $560,000 in salary, $4,101,079 in stock awards, $1,499,496 in option awards, $977,200 in non-equity incentive plan compensation, and $506 in all other compensation.

For the fiscal year ended December 31, 2020 (the "2020 Fiscal Year"), Defendant Trigg received $2,796,160 in total compensation from the Company. This included $483,039 in salary, $1,921,078 in option awards, $391,546 in non-equity incentive plan compensation, and $497 in all other compensation.

25.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Trigg made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share ($) | Proceeds ($) |
|---|---|---|---|
| 4/1/2021 | 57,500 | 55.37 | 3,184,005 |
| 5/3/2021 | 20,000 | 58.79 | 1,175,860 |
| 6/1/2021 | 20,000 | 47.90 | 957,940 |
| 8/2/2021 | 20,000 | 40.62 | 812,300 |
| 9/1/2021 | 20,000 | 49.16 | 983,240 |
| 9/17/2021 | 15,000 | 55.00 | 825,000 |
| 10/1/2021 | 42,500 | 48.70 | 2,069,580 |
| 11/1/2021 | 35,000 | 56.23 | 1,968,225 |
| 12/1/2021 | 20,000 | 47.24 | 944,720 |
| 1/3/2022 | 85,000 | 47.09 | 4,003,074 |
| 2/1/2022 | 20,000 | 37.50 | 750,040 |
| 3/1/2022 | 20,000 | 43.49 | 869,740 |
| 3/16/2022 | 3,631 | 39.77 | 144,404 |
| 4/1/2022 | 65,000 | 46.18 | 3,001,895 |
| 5/2/2022 | 30,000 | 35.88 | 1,076,250 |
| 5/17/2022 | 909 | 26.36 | 23,961 |
| 6/1/2022 | 30,000 | 20.95 | 628,410 |
| 8/1/2022 | 30,000 | 20.00 | 600,000 |
| 8/16/2022 | 914 | 21.48 | 19,632 |
| 11/11/2022 | 30,000 | 20.00 | 600,000 |
| 11/16/2022 | 1,832 | 19.29 | 35,338 |
| 12/1/2022 | 90,000 | 20.85 | 1,876,500 |
| 1/27/2023 | 6,281 | 27.92 | 175,365 |
| 2/1/2023 | 30,000 | 28.06 | 841,770 |
| 2/16/2023 | 3,015 | 24.36 | 73,445 |
| 3/1/2023 | 30,000 | 22.48 | 674,490 |

| 5/3/2023 | 40,000 | 20.00 | 800,120 |
| 5/16/2023 | 2,962 | 19.91 | 58,973 |
| 6/1/2023 | 20,000 | 21.10 | 421,920 |
| 7/3/2023 | 20,000 | 20.90 | 417,939 |
| 8/1/2023 | 20,000 | 20.22 | 404,460 |
| 11/16/2023 | 3,175 | 4.76 | 15,113 |
| 1/8/2024 | 14,188 | 5.49 | 77,892 |
| 1/16/2024 | 8,126 | 4.29 | 34,860 |
| 2/15/2024 | 5,320 | 3.57 | 18,992 |
| 5/16/2024 | 5,237 | 3.53 | 18,486 |

Thus, in total, before the fraud was exposed, Defendant Trigg sold 865,590 shares of Company stock on inside information, for which she received approximately $30,583,939 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrates her motive in facilitating and participating in the schemes.

26.     The 2024 Proxy Statement stated the following about Defendant Trigg:

Leslie Trigg has served as our President and CEO and a member of our Board since November 2014 and as Chair of our Board since February 2022. Ms. Trigg joined the Company from Warburg Pincus, a private equity firm, where she was an Executive in Residence from March 2012 to March 2014. Prior to that, Ms. Trigg served in several roles at Lutonix (acquired by CR Bard), a medical device company, from January 2010 to February 2012, most recently as Executive Vice President, and as Chief Business Officer of AccessClosure (acquired by Cardinal Health), a medical device company, from September 2006 to June 2009. She also previously held positions with FoxHollow Technologies (acquired by ev3/Covidien), a manufacturer of devices to treat peripheral artery disease, Cytyc, a diagnostic and medical device company, Pro-Duct Health (acquired by Cytyc), a medical device company, and Guidant, a cardiovascular medical device company. Ms. Trigg has served on the board of directors of ARYA Sciences Acquisition Corp IV, a special purpose acquisition company, since March 2021. Ms. Trigg also serves as the Chair of the board of directors of the Medical Device Manufacturers Association (MDMA). Previously, Ms. Trigg served on the board of directors of Adaptive Biotechnologies Corporation, a biotechnology company, from March 2021 to June 2023. Ms. Trigg holds a B.S. degree from Northwestern University and an M.B.A. from The Haas School of Business, University of California, Berkeley.

Key Qualifications:

We believe that Ms. Trigg is qualified to serve on our Board because of her corporate leadership, regulatory, commercial and industry experience gained through chief executive officer and other management roles at medical technology companies, including global businesses, as well as her experience as a corporate board member in the healthcare sector and as Chair of the MDMA board. As President and CEO of Outset for over eight years, Ms. Trigg's broad and deep knowledge of Outset, its day-to-day business operations and the competitive landscape provides valuable insights to our Board.

**Defendant Ahmed**

27.     Defendant Ahmed has served as the Company's CFO since August 2021. Defendant Ahmed previously joined Outset in May 2020 as the Company's Vice President, Controller and served as the Company's interim CFO from July 2021 to August 2021. According to the 2024 Proxy Statement, as of March 6, 2024, Defendant Ahmed beneficially owned 81,334 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on March 6, 2024 was $2.80, Defendant Ahmed owned approximately $227,735 worth of Outset stock as of that date.

28.     For the 2023 Fiscal Year, Defendant Ahmed received $2,328,951 in total compensation from the Company. This included $459,521 in salary, $1,715,620 in stock awards, $146,873 in non-equity incentive plan compensation, and $6,937 in all other compensation. For the 2022 Fiscal Year, Defendant Ahmed received $1,752,268 in total compensation from the Company. This included $457,134 in salary, $1,097,530 in stock awards, $191,180 in non-equity incentive plan compensation, and $6,424 in all other compensation. For the 2021 Fiscal Year, Defendant Ahmed received $1,784,411 in total compensation from the Company. This included $323,000 in salary, $75,000 in bonus, $574,354 in stock awards, $562,492 in option awards, $249,235 in non-equity incentive plan compensation, and $330 in all other compensation.

29.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Ahmed made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 3/9/2022 | 477 | 41.72 | 19,900 |
| 3/24/2022 | 424 | 42.65 | 18,083 |
| 4/1/2022 | 300 | 45.19 | 13,557 |
| 5/22/2022 | 200 | 35.00 | 7,000 |
| 5/17/2022 | 120 | 26.36 | 3,163 |
| 7/19/2022 | 787 | 16.56 | 13,032 |
| 8/16/2022 | 121 | 21.48 | 2,599 |
| 9/1/2022 | 87 | 18.05 | 1,570 |
| 11/16/2022 | 385 | 19.29 | 7,426 |
| 11/16/2022 | 385 | 19.29 | 7,426 |
| 11/16/2022 | 385 | 19.29 | 7,426 |
| 1/27/2023 | 4,938 | 27.92 | 137,868 |
| 2/16/2023 | 1,559 | 24.36 | 37,981 |
| 5/3/2023 | 990 | 20.00 | 19,800 |
| 5/16/2023 | 1,532 | 19.91 | 30,502 |
| 6/1/2023 | 990 | 20.83 | 20,621 |
| 7/3/2023 | 990 | 21.70 | 21,483 |
| 8/1/2023 | 990 | 20.07 | 19,869 |
| 9/1/2023 | 545 | 13.61 | 7,417 |
| 1/8/2024 | 10,709 | 5.49 | 58,792 |
| 1/16/2024 | 1,726 | 4.29 | 7,404 |
| 2/15/2024 | 4,403 | 3.57 | 15,718 |
| 3/1/2024 | 1,584 | 3.15 | 4,989 |
| 5/16/2024 | 3,918 | 3.53 | 13,830 |

Thus, in total, before the fraud was exposed, Defendant Ahmed sold 38,545 shares of Company stock on inside information, for which he received approximately $497,456 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

30.    The Company's website states the following about Defendant Ahmed:

Nabeel Ahmed joined Outset in May 2020 as the company's Vice President, Controller, and stepped in as interim CFO in July 2021, before being appointed CFO in August 2021. Prior to joining Outset Medical, Nabeel served as Vice President, Finance at 8×8, Inc., a communications platform provider and as Vice President, Finance at Vocera Communications, Inc. Previously, he held various leadership positions in accounting and finance, including as CFO of Wanderful Media as well as CFO of MarketTools, Inc. Earlier in his career, Nabeel held various positions of increasing responsibility at Ernst & Young LLP and eBay, Inc. Mr. Ahmed holds a Bachelor of Commerce from Laurentian University and an MBA from The Wharton School, University of Pennsylvania.

**Defendant Chambers**

31.    Defendant Chambers served as Outset's CFO from June 2019 until she resigned on July 16, 2021.

32.    For the 2021 Fiscal Year, Defendant Chambers received $1,621,853 in total compensation from the Company. This included $241,960 in salary, $679,986 in stock awards, $699,758 in option awards, and $149 in all other compensation. For the 2020 Fiscal Year, Defendant Chambers received $2,424,674 in total compensation from the Company. This included $375,673 in salary, $1,743,855 in option awards, $197,157 in non-equity incentive plan compensation, and $107,989 in all other compensation.

33.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Chambers made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 3/25/2021 | 16,727 | 49.64 | 830,311 |
| 4/27/2021 | 16,727 | 56.61 | 946,882 |
| 5/25/2021 | 16,727 | 45.11 | 754,538 |
| 6/24/2021 | 16,727 | 50.72 | 848,376 |

Thus, in total, before the fraud was exposed, Defendant Chambers sold 66,908 shares of Company stock on inside information, for which she received approximately $3,380,107 in proceeds. Her insider sales, made with knowledge of material nonpublic information

1
2

before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

3

**Defendant Drexler**

4
5
6
7
8
9
10

34.    Defendant Drexler has served as a Company director since January 2021 and also serves as a member of the Compensation Committee and as Chair of the Nominating and Corporate Governance Committee (the "Corporate Governance Committee"). According to the 2024 Proxy Statement, as of March 6, 2024, Defendant Drexler beneficially owned 15,551 shares of the Company's common stock. Given the price per share of the Company's common stock at the close of trading on March 6, 2024 was $2.80, Defendant Drexler owned approximately $43,543 worth of Outset stock as of that date.

11
12
13
14
15
16
17

35.    For the 2023 Fiscal Year, Defendant Drexler received $224,171 in total compensation from the Company. This included $64,176 in fees earned or paid in cash and $159,995 in stock awards. For the 2022 Fiscal Year, Defendant Drexler received $214,984 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $149,984 in stock awards. For the 2021 Fiscal Year, Defendant Drexler received $474,565 in total compensation from the Company. This included $62,091 in fees earned or paid in cash and $412,474 in stock awards.

18
19
20
21
22
23
24
25
26
27
28

36.    The 2024 Proxy Statement stated the following about Defendant Drexler:

Karen Drexler has served on our Board since January 2021. Ms. Drexler has served on the board of directors of ResMed Inc., a medical device company, since November 2017, on the board of directors of Tivic Health Systems, Inc., a bioelectronic medicine company, since August 2019, and on the board of directors of EBR Systems, Inc., a cardiac pacing company, since October 2021. She also currently serves on the boards of directors of two private companies: VIDA Health, a lung intelligence solutions and analytics company and Huma.AI, a healthcare artificial intelligence company. Ms. Drexler previously served as CEO of Sandstone Diagnostics, Inc., a private company developing instruments and consumables for point-of-care medical testing, from June 2016 until July 2020. From 2011 to 2017, she served as chair of the board of Hygieia, Inc., a private digital insulin therapy company. Ms. Drexler has also served on the board of directors of a number of private companies in the fields of diagnostics, medical devices, and digital health. Ms. Drexler was

founder, president, and CEO of Amira Medical Inc., a private company focused on glucose monitoring technology, from 1996 until it was sold to Roche Holding AG in 2001. Prior to that, she held management roles at LifeScan, a medical device company, including leading its manufacturing function, and played a key role in its sale to Johnson & Johnson. Ms. Drexler is also a member of the G100 Network and Stanford Women on Boards. Ms. Drexler holds a B.S.E. from Princeton University and an M.B.A from the Stanford University Graduate School of Business.

Key Qualifications:

We believe that Ms. Drexler is qualified to serve on our Board because of her corporate leadership and industry experience gained through chief executive officer and other management roles at medical device companies, as well as her experience as a board member at several companies in the medical device industry. Ms. Drexler also brings to the Board experience in business development and strategic transactions, a background in manufacturing operations, and a deep understanding of using data analytics coupled with a consumer-centric approach to create a better patient experience.

**Defendant Grossman**

37.     Defendant Grossman has served as the Company's Lead Independent Director since February 2022 and served as Chairman of the Board from April 2014 to February 2022. Defendant Grossman also serves as a member of the Compensation Committee and the Corporate Governance Committee. According to the 2024 Proxy Statement, as of March 6, 2024, Defendant Grossman beneficially owned 299,856 shares of the Company's common stock. Given the price per share of the Company's common stock at the close of trading on March 6, 2024 was $2.80, Defendant Grossman owned approximately $839,597 worth of Outset stock as of that date.

38.     For the 2023 Fiscal Year, Defendant Grossman received $264,995 in total compensation from the Company. This included $105,000 in fees earned or paid in cash and $159,995 in stock awards. For the 2022 Fiscal Year, Defendant Grossman received $249,984 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $149,984 in stock awards. For the 2021 Fiscal Year, Defendant Grossman received $249,999 in total compensation from the Company. This included

$100,000 in fees earned or paid in cash and $149,999 in stock awards. For the 2020 Fiscal Year, Defendant Grossman received $226,409 in total compensation from the Company. This included $100,000 in fees earned or paid in cash and $126,409 in option awards.

39.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Grossman made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| 4/1/2021 | 2,592 | 55.06 | 142,720 |
| 5/3/2021 | 2,592 | 58.72 | 152,204 |
| 7/1/2021 | 1,296 | 49.23 | 63,804 |
| 9/1/2021 | 1,296 | 49.17 | 63,721 |
| 9/17/2021 | 5,184 | 55.00 | 285,120 |
| 10/1/2021 | 1,296 | 49.69 | 64,398 |
| 11/1/2021 | 3,888 | 54.66 | 212,498 |
| 12/1/2021 | 1,296 | 47.92 | 62,104 |
| 6/3/2024 | 38,117 | 3.77 | 143,777 |

Thus, in total, before the fraud was exposed, Defendant Grossman sold 57,557 shares of Company stock on inside information, for which he received approximately $1,190,346 in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

40.    The 2024 Proxy Statement stated the following about Defendant Grossman:

D. Keith Grossman has served as our Lead Independent Director since February 2022 and served as Chairman of our Board from April 2014 to February 2022. Mr. Grossman has served as Chairman of the board of directors of Nevro Corp. ("Nevro"), a global medical device company, since October 2023 where he previously served as Executive Chairman from April 2023 to October 2023 and as Chairman and Chief Executive Officer from March 2019 to April 2023. Mr. Grossman has also served as Vice Chairman of Alcon Inc., an eye care products company, since April 2019. Previously, he was Chief Executive Officer and President of Thoratec, a medical device company, from September 2014 to December 2015 and from January 1996 to January 2006; Chief Executive Officer and President of Conceptus, a

manufacturer and developer of medical devices, from December 2011 to June 2013; and Managing Director for TPG, a private equity firm, from September 2007 to December 2011. He also previously held positions with Eon Labs, a pharmaceutical company, SulzerMedica, a manufacturer of implantable medical devices, and American Hospital Supply/McGaw Labs, a medical supply company. Mr. Grossman served on the board of directors of ViewRay, a medical device company in the field of cancer therapy, from July 2018 to February 2021; Zeltiq (acquired by Allergan), a company that markets and licenses devices used for cryolipolysis procedures, from October 2013 to May 2017; Kyphon (acquired by Medtronic plc), a medical device company, from May 2007 to November 2007; Intuitive Surgical, a medical device company, from April 2003 to April 2010; and Tandem Diabetes Care, a medical device company, from April 2010 to January 2012. Mr. Grossman has also served on the board of directors of a number of private companies. Mr. Grossman holds a B.S. from Ohio State University and an M.B.A. from the George L. Graziadio School of Business and Management, Pepperdine University.

Key Qualifications:

We believe that Mr. Grossman is qualified to serve on our Board because of his corporate leadership, regulatory, commercial and industry experience gained through chief executive officer roles at medical technology companies, including his prior experience as Chairman and Chief Executive Officer of a global public company in the medical device field. Mr. Grossman also brings to the Board experience as a board member and investor at a range of private and public companies in the medical technology industry, as well as experience in business development and strategic transactions. We believe Mr. Grossman's extensive experience leading medical device companies through commercial growth aligns with our commercial strategies in both the acute and home markets.

**Defendant Hackett**

41.    Defendant Hackett has served as a Company director since May 2019. Defendant Hackett also serves as Chair of the Corporate Governance Committee and as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 6, 2024, Defendant Hackett beneficially owned 48,142 shares of the Company's common stock. Given the price per share of the Company's common stock at the close of trading on

Verified Shareholder Derivative Complaint

March 6, 2024 was $2.80, Defendant Hackett owned approximately $134,798 worth of Outset stock as of that date.

42.    For the 2023 Fiscal Year, Defendant Hackett received $224,995 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $159,995 in stock awards. For the 2022 Fiscal Year, Defendant Hackett received $209,984 in total compensation from the Company. This included $60,000 in fees earned or paid in cash and $149,984 in stock awards. For the 2021 Fiscal Year, Defendant Hackett received $209,999 in total compensation from the Company. This included $60,000 in fees earned or paid in cash and $149,999 in stock awards. For the 2020 Fiscal Year, Defendant Hackett received $181,691 in total compensation from the Company. This included $30,000 in fees earned or paid in cash and $151,691 in option awards.

43.    The 2024 Proxy Statement stated the following about Defendant Hackett:

Patrick T. Hackett has served on our Board since May 2019. Mr. Hackett has served on the board of directors of Intelligent Medical Objects, a private healthcare software company, since January 2017. Previously, Mr. Hackett served as a Managing Director at Warburg Pincus, a private equity firm, from June 1990 to July 2017, where he focused on investments in the technology and healthcare services fields across the firm's global territories, and he currently serves as a senior advisor to Warburg Pincus. He previously held positions with Cove Capital Associates, a private merchant banking partnership, Acadia Partners, a private equity firm, and Donaldson, Lufkin and Jenrette, an investment bank. Mr. Hackett has served on the board of directors of Stamford Health System, a nonprofit community hospital in Connecticut, since May 2016, including as its Chair from October 2020 to September 2022. He also served on the board of directors of Bridgepoint Education, a provider of post-secondary education services, from February 2008 to November 2017; Yodlee (acquired by Envestnet), a data aggregation and data analytics platform company, from January 2008 to October 2015; and Nuance Communications (acquired by Microsoft), a provider of voice and language software, from January 2009 to September 2014. Mr. Hackett has also served on the board of directors of a number of private companies. Mr. Hackett holds a B.A. from the University of Pennsylvania and a B.S. from The Wharton School, University of Pennsylvania.

Key Qualifications:

We believe that Mr. Hackett is qualified to serve on our Board because of his industry knowledge and significant experience in business development and strategic transactions gained as a corporate board member and investor in healthcare services companies. Through his global private equity role, Mr. Hackett's extensive involvement in the investment and transaction evaluation processes requires a deep understanding of the financial and operational performance of companies across various industries and geographic territories that we believe provides valuable insight to our Board.

**Defendant Hinrichs**

44.     Defendant Hinrichs served as a Company director from February 2020 until he resigned on August 15, 2024. According to the 2024 Proxy Statement, as of March 6, 2024, Defendant Hinrichs beneficially owned 142,604 shares of the Company's common stock. Given the price per share of the Company's common stock at the close of trading on March 6, 2024 was $2.80, Defendant Hinrichs owned approximately $399,291 worth of Outset stock as of that date.

45.     For the 2023 Fiscal Year, Defendant Hinrichs received $224,995 in total compensation from the Company. This included $65,000 in fees earned or paid in cash and $159,995 in stock awards. For the 2022 Fiscal Year, Defendant Hinrichs received $209,984 in total compensation from the Company. This included $60,000 in fees earned or paid in cash and $149,984 in stock awards. For the 2021 Fiscal Year, Defendant Hinrichs received $209,999 in total compensation from the Company. This included $60,000 in fees earned or paid in cash and $149,999 in stock awards. For the 2020 Fiscal Year, Defendant Hinrichs received $425,842 in total compensation from the Company. This included $50,769 in fees earned or paid in cash and $375,073 in option awards.

46.     The 2024 Proxy Statement stated the following about Defendant Hinrichs:

Jim Hinrichs has served on our Board since February 2020. Mr. Hinrichs has served as Co-Founder of Atmas Health, a healthcare partnership focused on acquiring healthcare assets, since September 2022. He has also served on the board of directors of Orthofix Medical Inc., a spinal care solutions company, since April 2014, and on the board of directors of Integer Holdings Corporation, a medical device manufacturing company, since February 2018. Mr. Hinrichs previously served as Chief Financial Officer of Cibus from May

2018 to July 2019 and Executive Vice President and Chief Financial Officer of Alere (acquired by Abbott Labs), a diagnostics company, from April 2015 to October 2017. Mr. Hinrichs previously held various positions at CareFusion (acquired by Becton Dickinson), a medical device company, serving as Chief Financial Officer from December 2010 to March 2015, Senior Vice President Global Customer Support from December 2009 to December 2010, and SVP Controller from January 2009 to December 2009. Before that, Mr. Hinrichs held various financial leadership positions at Cardinal Health and Merck & Co. Mr. Hinrichs served on the board of directors of Acutus Medical, Inc., a dynamic arrhythmia care company, from September 2019 to August 2022. Mr. Hinrichs holds a B.S. from Carnegie Mellon University and an M.S. from The Tepper School of Business, Carnegie Mellon University.

Key Qualifications:

We believe that Mr. Hinrichs is qualified to serve on our Board because of his corporate leadership and industry experience gained through chief financial officer and other executive roles at global healthcare and medical technology companies, his extensive experience in business development and strategic transactions, and his experience as a board member and investor in the medical technology industry. Mr. Hinrichs also brings to the Board significant expertise in financial operations, accounting, governance and general risk management matters gained through his career as a financial executive, and as an audit committee member of multiple other public companies.

**Defendant Jones**

47.     Defendant Jones has served as a Company director since April 2022. He also serves as Chair of the Compensation Committee. According to the 2024 Proxy Statement, as of March 6, 2024, Defendant Jones beneficially owned 11,120 shares of the Company's common stock. Given the price per share of the Company's common stock at the close of trading on March 6, 2024 was $2.80, Defendant Jones owned approximately $31,136 worth of Outset stock as of that date.

48.     For the 2023 Fiscal Year, Defendant Jones received $220,819 in total compensation from the Company. This included $60,824 in fees earned or paid in cash and $159,995 in stock awards.  For the 2022 Fiscal Year, Defendant Jones received $447,048

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

in total compensation from the Company. This included $34,583 in fees earned or paid in cash and $412,465 in stock awards.

49.    The 2024 Proxy Statement stated the following about Defendant Jones:

Dale E. Jones has served on our Board since April 2022. Mr. Jones has served as Chief Executive Officer of Magna Vista Partners, a global leadership consulting firm, since September 2022. He has also served as a senior advisor to Diversified Search Group, an executive search firm, since January 2022, where he previously served as President and Chief Executive Officer from January 2015 to December 2021 and as President from October 2013 to January 2015. Prior to that, Mr. Jones served as Vice Chairman and partner of the CEO and Board Practice in the Americas at Heidrick & Struggles from 2009 to 2013. From 2007 to 2009, he served as Chief Executive Officer of PlayPumps International and as Executive Vice President of Revolution LLC, a venture capital firm that funded a philanthropic initiative to provide clean drinking water to Africa. Mr. Jones held several executive leadership positions at Heidrick & Struggles from 1999 to 2007. Mr. Jones has served on the board of directors of Chick-fil-A, Inc. a fast food restaurant chain, since January 2021. Previously, he served on the boards of directors of Northwestern Mutual, a financial services company, from 2007 to May 2022, of Kohl's Corporation, an omnichannel retailer, from 2008 to 2016, and of Hughes Supply from 2003 to 2006 (prior to its acquisition by The Home Depot). Mr. Jones holds a B.A. from Morehouse College.

Key Qualifications:

We believe Mr. Jones is qualified to serve on our Board because of his extensive experience as a senior advisor to chief executives, other senior leaders and boards of directors around the globe on human capital issues including executive recruiting, retention, succession planning, talent management and corporate governance. Mr. Jones also brings to the Board broad-based knowledge in the areas of consumer products and executive compensation, decades of experience in building diverse and dynamic teams, as well as experience as a corporate board member.

**Defendant Saia**

50.    Defendant Saia has served as a Company director since March 2021. Defendant Saia also serves as a member of the Audit Committee. According to the 2024 Proxy Statement, as of March 6, 2024, Defendant Saia beneficially owned 15,211 shares

of the Company's common stock. Given the price per share of the Company's common stock at the close of trading on March 6, 2024 was $2.80, Defendant Saia owned approximately $42,591 worth of Outset stock as of that date.

51.    For the 2023 Fiscal Year, Defendant Saia received $214,995 in total compensation from the Company. This included $55,000 in fees earned or paid in cash and $159,995 in stock awards.  For the 2022 Fiscal Year, Defendant Saia received $199,984 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $149,984 in stock awards. For the 2021 Fiscal Year, Defendant Saia received $451,197 in total compensation from the Company. This included $38,710 in fees earned or paid in cash and $412,487 in stock awards.

52.    The 2024 Proxy Statement stated the following about Defendant Saia:

Andrea L. Saia has served on our Board since March 2021. Ms. Saia has served on the board of directors of Align Technology, Inc., a global medical technology company, since July 2013. She previously served as the Global Head of Vision Care in the Alcon division of Novartis AG, a global healthcare company, from 2011 until her retirement in 2012. Prior to that role, she served as President and Chief Executive Officer of CibaVision, a subsidiary of Novartis, from 2008 to 2011, and prior to that, she held various positions at CibaVision since joining in 2002, including President of Europe, Middle East and Africa operations, President of the Global Lens Business and Global Head of Marketing. Ms. Saia was the Chief Marketing Officer for GCG Partners and also held senior management and marketing positions with global consumer products companies such as Procter & Gamble, Unilever and Revlon. Previously, Ms. Saia served on the boards of directors of LivaNova PLC, a global medical technology company, from July 2016 to December 2023, and of Coca-Cola Enterprises, Inc., the marketer, producer and distributor of Coca-Cola products in European markets from 2012 to 2016. Ms. Saia is also a member of the National Association of Corporate Directors, Women Corporate Directors, the Signature Program and serves on the board of visitors for the Farmer School of Business at Miami University. Ms. Saia holds a B.S. from Miami University and an M.B.A. from Northwestern University's J.L. Kellogg Graduate School of Management.

<u>Key Qualifications:</u>

We believe that Ms. Saia is qualified to serve on our Board because of her significant global business experience, her corporate leadership, regulatory, industry and commercial experience gained through chief executive officer and other management roles, as well as her experience as a board member at companies in the healthcare, medical technology and consumer products industries. Ms. Saia also brings to the Board a background in building multinational brands with a consumer health focus and extensive knowledge in both the medical technology and consumer products spaces, which we believe align with our vision to create a differentiated experience in the home for dialysis patients.

**Defendant Szyman**

53.    Defendant Szyman served as a Company director from May 2021 until she resigned on March 12, 2024.

54.    For the 2023 Fiscal Year, Defendant Szyman received $214,995 in total compensation from the Company. This included $55,000 in fees earned or paid in cash and $159,995 in stock awards. For the 2022 Fiscal Year, Defendant Szyman received $199,984 in total compensation from the Company. This included $50,000 in fees earned or paid in cash and $149,984 in stock awards. For the 2021 Fiscal Year, Defendant Szyman received $443,244 in total compensation from the Company. This included $30,780 in fees earned or paid in cash and $412,464 in stock awards.

55.    The Schedule 14A the Company filed with the SEC on April 13, 2023 (the "2023 Proxy Statement") stated the following about Defendant Szyman:

Catherine Szyman has served on our Board since May 2021. Ms. Szyman has served as Corporate Vice President of Critical Care at Edwards Lifesciences Corporation, a global medical technology company, since January 2015, and on the board of directors of Inari Medical, Inc., a medical device company, since November 2019. She also currently serves on the board of directors of Endotronix, a private medical device company, on the board of directors of the American Heart Association of Orange County, and on the board of governors at Opus College of Business at the University of St. Thomas. Ms. Szyman worked at Medtronic plc from August 1991 to December 2014 in various leadership roles, including Senior Vice President and President of Global Diabetes, Senior Vice President of Corporate Strategy and Business Development, Vice President and General Manager for the endovascular

business and Vice President of Finance for the vascular business. Ms. Szyman holds a B.A. from the University of St. Thomas and an M.B.A. from Harvard Business School.

KEY QUALIFICATIONS:

We believe that Ms. Szyman is qualified to serve on our Board because of her corporate leadership, regulatory and industry experience gained through executive and management roles at global medical technology companies, her experience in business development and strategic transactions, as well as her experience as a board member in the medical technology industry. We believe Ms. Szyman's commercial growth acumen both in the critical care and consumer diabetes space aligns with our focus on transforming the dialysis experience for patients in both the acute and home setting.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

56.     By reason of their positions as officers, directors, and/or fiduciaries of Outset and because of their ability to control the business and corporate affairs of Outset, the Individual Defendants owed Outset and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Outset in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Outset and its shareholders so as to benefit all shareholders equally.

57.     Each director and officer of the Company owes to Outset and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

58.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Outset, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

59.     To discharge their duties, the officers and directors of Outset were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

60.    Each Individual Defendant, by virtue of their position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Outset, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

61.    As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

62.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and

directors of Outset were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Outset's corporate governance and applicable codes of conduct and/or ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Outset conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Outset and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Outset's operations would comply with all applicable laws and Outset's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other

financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

63.    Each of the Individual Defendants further owed to Outset and the shareholders the duty of loyalty requiring that each favor Outset's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

64.    At all times relevant hereto, the Individual Defendants were the agents of each other and of Outset and were at all times acting within the course and scope of such agency.

65.    Because of their advisory, executive, managerial, directorial, and controlling positions with Outset, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

66.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Outset.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

67.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

68.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the

Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

69.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Outset was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

70.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

71.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Outset and was at all times acting within the course and scope of such agency.

## OUTSET'S CODE OF CONDUCT AND CORPORATE GOVERNANCE

### Outset's Code of Conduct

72.    Outset's Code of Business Conduct and Ethics ("Code of Conduct") states the following in its "Introduction" section, in relevant part:

Outset Medical, Inc. (the "Company" or "Outset") is committed to maintaining the highest standards of business conduct and ethics. This Code

of Business Conduct and Ethics (the "Code") reflects the business practices and principles of behavior that support this commitment. We expect every employee, officer and director of Outset to read and understand the Code and its application to the performance of his or her business responsibilities. References in the Code to employees are intended to cover officers and, as applicable, directors. Officers, managers and other supervisors are expected to develop in employees a sense of commitment to the spirit, as well as the letter, of the Code. Supervisors are also expected to ensure that all agents and contractors conform to Code standards when working for or on behalf of Outset. Nothing in the Code alters the at-will employment policy of the Company. The Code addresses conduct that is particularly important to proper dealings with the people and entities with whom we interact, but reflects only a part of our commitment. From time to time we may adopt additional policies and procedures with which our employees, officers and directors are expected to comply. However, it is the responsibility of each employee to apply common sense, together with his or her own highest personal ethical standards, in making business decisions where there is no stated guideline in the Code.

73.    In a section titled "Honest and Ethical Conduct," the Code of Conduct states:

It is our policy to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of Outset depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity.

74.    In a section titled "Legal Compliance," the Code of Conduct states:

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. We hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment, including laws prohibiting insider trading (which are discussed in further detail in Section 3 below). While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Chief Compliance Officer, or in the absence of an appointed Chief Compliance Officer, the General Counsel (as further described in Section 23). In the

absence of an appointed Chief Compliance Officer, all references to Chief Compliance Officer in this Code shall mean General Counsel. Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including emails and chat transcripts, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. You must fully cooperate with any such audits and investigations, including by providing truthful, accurate and complete information and complying with any applicable instructions provided by the Legal department.

75.    In a section titled "Insider Trading," the Code of Conduct states:

Employees who have access to confidential (or "inside") information obtained through their position at the Company are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about the Company or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees must exercise the utmost care when handling material inside information. Please refer to the Company's Insider Trading Policy for more detailed information.

76.    With respect to "Reporting Possible Violations," the Code of Conduct states the following, in relevant part:

If you encounter a situation or are considering a course of action and its appropriateness is unclear, discuss the matter promptly with your supervisor or the Chief Compliance Officer; even the appearance of impropriety can be very damaging and should be avoided. If you are aware of a suspected or actual violation of laws, regulations, the Code or any other Company policy, you have a responsibility to report it. You are expected to promptly provide a compliance resource with a specific description of the violation that you believe has occurred, including any information you have about the persons involved and the time of the violation. Further, the Company encourages and expects each of us to report when we feel we are being pressured to compromise standards that may lead to a potential violation. Please report these matters directly to your supervisor or the Chief Compliance Officer. Whether you choose to speak with your supervisor or the Chief Compliance Officer, you should do so without fear of any form of retaliation. The Company does not tolerate retaliation in any form against anyone who in good

faith reports suspected violations or unethical behavior or who participates in an investigation regarding suspected violations or unethical behavior. Making a report in "good faith" means that you have provided all the information you have and that you reasonably believe there has been a possible violation of applicable law, regulation, rule or standard, this Code or any other Company policy, even if your report turns out to be unsubstantiated. If you feel that you have been retaliated against in any manner whatsoever, please notify Legal or People Operations immediately. Those who engage in retaliation will be subject to disciplinary action up to and including termination. If for any reason you do not wish to discuss suspected violations or unethical behavior directly with the Company, please contact the Company's Toll-Free Hotline (the "Hotline"). Calls may be made for any reason at any time, around the clock. In order to provide additional assurance of anonymity, all Hotline calls are taken by a trained third-party vendor. The toll free number to call in North America is 877-306- 7946. If you are outside North America, or if you prefer to use the internet, you may voice your concerns by filling out the web form located at https://www.whistleblowerservices.com/OM. Supervisors must promptly report any complaints or observations of Code violations to the Chief Compliance Officer. If you believe your supervisor has not taken appropriate action, you should contact the Chief Compliance Officer directly. The Chief Compliance Officer will investigate all reported possible Code violations promptly and with the highest degree of confidentiality that is possible under the specific circumstances. Neither you nor your supervisor may conduct any preliminary investigation, unless authorized to do so by the Chief Compliance Officer. Your cooperation in the investigation will be expected. As needed, the Chief Compliance Officer will consult with legal counsel, the People Operations department and/or Audit Committee of the Board of Directors. It is our policy to employ a fair process by which to determine violations of the Code. With respect to any complaints or observations of violations that may involve accounting, internal accounting controls and auditing concerns, under the Company's Whistleblower Policy, the Chief Compliance Officer shall promptly inform the Audit Committee, and the Audit Committee shall be responsible for supervising and overseeing the inquiry and any investigation that is undertaken. If a potential violation is reported via the confidential hotline or email address as provided under the Whistleblower Policy, the Audit Committee will be notified automatically and directly. If any investigation indicates that a violation of the Code has probably occurred, we will take such action as we believe to be appropriate under the circumstances. If we determine that an employee is responsible for a Code violation, he or she will be subject to disciplinary action up to, and including, termination of employment and, in appropriate cases, civil action

or referral for criminal prosecution. Appropriate action may also be taken to deter any future Code violations.

77.    In a section titled "Protection and Proper Use of Company Assets," the Code of Conduct states the following, in relevant part:

All employees are expected to protect our assets and ensure their efficient use. Theft, carelessness, and waste have a direct impact on our profitability. Our property, such as office supplies, computer equipment, and buildings, are expected to be used only for legitimate business purposes, although incidental personal use may be permitted, provided that the use complies with Company policy. You may not, however, use our corporate name, any brand name or trademark owned or associated with the Company or any letterhead for any personal purpose. You may not, while acting on behalf of the Company or while using our computing or communications equipment or facilities, either: • access the internal computer system or other resource of another entity without express written authorization from the entity responsible for operating that resource; or • violate the intellectual property or privacy rights of others, or commit any unlawful or illegal act, including harassment, libel, fraud, sending of unsolicited bulk email (also known as "spam") or material of objectionable content in violation of applicable law, trafficking in contraband of any kind or any kind of espionage.

78.    In a section titled "Conflicts of Interest," the Code of Conduct states the following, in relevant part:

We respect the rights of our employees to manage their personal affairs and investments and do not wish to impinge on their personal lives. At the same time, employees should avoid conflicts of interest that occur when their personal interests may interfere in any way with the performance of their duties or the best interests of the Company. A conflicting personal interest could result from an expectation of personal gain now or in the future or from a need to satisfy a prior or concurrent personal obligation. We expect our employees to be free from influences that conflict with the best interests of the Company or might deprive the Company their undivided loyalty in business dealings. Even the appearance of a conflict of interest where none actually exists can be damaging and should be avoided. Whether or not a conflict of interest exists or will exist can be unclear. Conflicts of interest are prohibited unless specifically authorized as described below. If you have any questions about a potential conflict or if you become aware of an actual or potential conflict, and you are not an officer or director of the Company, you should discuss the matter with your supervisor or the Chief Compliance

Officer. Supervisors may not authorize conflict of interest matters or make determinations as to whether a problematic conflict of interest exists without first seeking the approval of the Chief Compliance Officer and providing the Chief Compliance Officer with a written description of the activity. If the supervisor is involved in the potential or actual conflict, you should discuss the matter directly with the Chief Compliance Officer. Officers and directors may seek authorizations and determinations from the Company's Nominating and Corporate Governance Committee.

79.    In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Outset's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

**_Outset's Audit Committee Charter_**

80.    Outset's Audit Committee Charter states that the purpose of the Audit Committee is as follows:

The purpose of the Audit Committee (the "Committee") of the Board of Directors (the "Board") of the Company is to assist the Board in its oversight of (i) the Company's accounting and financial reporting processes and the audit of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the qualifications and independence of the Company's external auditor (the "Independent Auditor"), and (iv) the performance of the Company's internal auditing function ("Internal Audit") and the Independent Auditor. The Committee shall also prepare the report of the Committee required to be included in the Company's annual report or proxy statement relating to the election of directors. The Board recognizes that while the Committee has been given certain duties and responsibilities pursuant to this Charter, the Committee is not responsible for

guaranteeing the accuracy of the Company's financial statements or the quality of the Company's accounting and financial reporting processes. The fundamental responsibility for the Company's financial statements and disclosures rests with management.

81.    In a section titled "Duties and Responsibilities," the Audit Committee Charter states the following, in relevant part:

In furtherance of this purpose, the Committee shall:

1. Be directly responsible for the appointment, compensation, retention, oversight of the work of, and termination of the Independent Auditor and any other independent registered public accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company. The Committee shall also be responsible for the resolution of disagreements between management and the Independent Auditor and any such other firm regarding accounting and financial reporting. The Independent Auditor and any such other firm shall report directly to the Committee. 2. Meet to review and discuss the annual audited financial statements and quarterly financial statements with management and the Independent Auditor, including the disclosures under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations." The Committee shall make a recommendation to the Board as to whether the annual audited financial statements should be included in the Company's Annual Report on Form 10-K. 3. Discuss earnings press releases, as well as financial information and earnings guidance provided to analysts and ratings agencies.

*** 

7. Obtain and review annually, prior to the completion of the Independent Auditor's annual audit of the Company's year-end financial statements (the "Annual Audit"), a report from the Independent Auditor, describing (i) all critical accounting policies and practices to be reflected in the Annual Audit, (ii) all alternative treatments of financial information within generally accepted accounting principles ("GAAP") for policies and procedures related to material items that have been discussed with management, ramifications of the use of such alternative disclosures and treatments, and the treatment preferred by the Independent Auditor, and (iii) other material written communications between the Independent Auditor and management, such as any management letter or schedule of unadjusted differences. Review any reports on such topics or similar topics prepared by management. Discuss with the Independent Auditor any material issues raised in such reports. 8. Review

and evaluate the lead audit partner of the Independent Auditor (taking into account the opinions of management and Internal Audit (if applicable)) and assure the regular rotation of the lead audit partner, the concurring partner and other audit partners engaged in the Annual Audit, to the extent required by law. 9. Review the Company's financial reporting processes and internal controls, based on consultation with the Independent Auditor and Internal Audit (if applicable). Such review shall include a consideration of major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles, and major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of identified deficiencies. Review any analyses prepared by management and/or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements.

*** 

23. Set clear hiring policies for employees or former employees of the Independent Auditor and oversee the hiring of any personnel from the Independent Auditor into positions within the Company in accordance with the hiring restrictions of the Sarbanes-Oxley Act of 2002. 24. Establish procedures for (i) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and (ii) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting, internal accounting controls or auditing matters. Review periodically with management and Internal Audit these procedures and any significant complaints received. 25. Meet separately, periodically, with management, with Internal Audit (or other Company personnel responsible for the internal audit function, in each case, if applicable) and with the Independent Auditor.

82.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit

Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

83.    Outset is a medical technology company, incorporated in Delaware and located in California. The Company was founded in 2003 and its primary products, including the Tablo and the TabloCart, devices used in kidney dialysis treatment.

84.    In 2014, Tablo was cleared for use in patients with acute and/or chronic renal failure, with or without ultrafiltration, in the settings of an acute or chronic care facility under Section 510(k) of the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 C.F.R. § 807.81(a). Later, in March 2020, Tablo received clearance for home use under Section 510(k) of the FDCA.

85.    The 510(k) program is a marketing clearance process, pursuant to which Outset had permission to market Tablo and demonstrate that it was as safe and effective as another FDA-approved device. Notably, significant modifications affecting the safety and/or efficacy of a device that has previously received 510(k) clearance may necessitate additional 510(k) applications and clearances.

86.    In the 510(k) clearance process, before a device may be marketed, the FDA must determine that a proposed device is substantially equivalent to a legally marketed predicate device, which includes a device that has been previously cleared through the 510(k) process, a device that was legally marketed prior to May 28, 1976 (pre-amendments device), a device that was originally on the U.S. market pursuant to an approved Premarket Approval ("PMA") and later down-classified, or a 510(k)-exempt device. To be substantially equivalent, the proposed device must have the same intended use as the predicate device, and either have the same technological characteristics as the predicate

device or have different technological characteristics and not raise different questions of safety or effectiveness than the predicate device. Clinical data are sometimes required to support substantial equivalence. The FDA's 510(k) clearance process usually takes from three to twelve months but can last longer.

87.    Educational and promotional activities and training methods must comply with FDA and other applicable laws.  These laws include the prohibition of the promotion of a medical device for a use that has not been cleared or approved by the FDA.  Use of a device outside of its cleared or approved indications is known as "off-label" use,  If the FDA determines that educational and promotional activities or training constitutes promotion of an off-label use, it may request that a company modify its training or promotional materials or subject the company to regulatory or enforcement actions, including the issuance of warning letters, untitled letters, fines, penalties, injunctions, or seizures.  It is also possible that other federal, state or foreign enforcement authorities might take action if they consider educational and promotional activities or training methods to constitute promotion of an off-label use, which could result in significant fines or penalties under other statutory authorities, such as laws prohibiting false claims for reimbursement.

88.    Outset commenced an initial public offering ("IPO") on or about September 15, 2020, the beginning of the Relevant Period, selling 10.29 million shares of common stock to the public at a price of $27 per share.  In connection with the IPO, the Company filed a Registration Statement on Form S-1 on August 21, 2020, Amendment No. 1 to the Registration Statement on Form S-1/A on September 9, 2020, and a Form S-1 IMEF on September 14, 2020 (together, the "Registration Statement").  On September 16, 2024, the Company filed a Prospectus on Form 424B4 (the "IPO Prospectus") (together, the Registration Statement and IPO Prospectus are the "IPO Offering Documents").  Defendants Trigg and Chambers signed the IPO Offering Documents.

**False and Misleading Statements**

***IPO Offering Documents***

89.    The Relevant Period began on September 15, 2020 when the Company's common stock began trading on the NASDAQ. Outset boasted in its IPO Offering Documents that Tablo was a "dialysis clinic on wheels" that "allows providers to standardize to a single technology platform from the hospital to the home." In relevant part, Outset stated:

> Our technology is designed to elevate the dialysis experience for patients, and help providers overcome traditional care delivery challenges. Requiring only an electrical outlet and tap water to operate, Tablo frees patients and providers from the burdensome infrastructure required to operate traditional dialysis machines. The integration of water purification and on-demand dialysate production enables Tablo to serve as a dialysis clinic on wheels and allows providers to standardize to a single technology platform from the hospital to the home.

90.    In addition, Outset represented that "Tablo is currently cleared by the United States Food and Drug Administration (FDA) for use in the hospital, clinic or home setting," and that its "policy is to refrain from statements that could be considered off-label promotion of Tablo." Outset repeated these representations in: (1) its quarterly report on Form 10-Q filed with the SEC on November 12, 2020 for the quarterly period ended September 30, 2020 (signed by Defendants Trigg and Chambers); (2) its annual report on Form 10-K filed with the SEC on March 22, 2021 for the 2020 Fiscal Year ("2020 10-K") (signed by Defendants Trigg, Chambers, Grossman, Drexler, Hackett, and Hinrichs); (3) its annual report on Form 10-K filed with the SEC on February 23, 2022 for the 2021 Fiscal Year ("2021 10-K") (signed by Defendants Trigg, Ahmed, Grossman, Drexler, Hackett, Hinrichs, Saia, and Szyman); and (4) its annual report on Form 10-K filed with the SEC on February 13, 2023 for the 2022 Fiscal Year (signed by Defendants Trigg, Ahmed, Grossman, Drexler, Hackett, Hinrichs, Jones, Saia, and Szyman).

91.    The IPO Offering Documents and 2020 10-K also boasted that Tablo was "the first and only fully integrated hemodialysis system that can be used to deliver treatment across all care settings from the ICU to home."

### *November 11, 2020 Press Release*

92.    On November 11, 2020, Outset published a press release announcing its financial results for the third quarter of the 2020 Fiscal Year ("3Q20") and stating that it had "[r]ecorded net revenue of $13.8 million in the third quarter of 2020, a 423% increase compared to $2.6 million in the third quarter of 2019." In the press release, Defendant Trigg also stated, "Our commercial momentum continued to accelerate in the third quarter as we signed new contracts with some of the largest national and regional health systems in the country."

### *November 12, 2020 Form 10-Q*

93.    On November 12, 2020, Outset filed its quarterly report on Form 10-Q with the SEC for 3Q20 (the "3Q20 10-Q"), which included Certifications Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendants Trigg and Chambers, respectively, which stated:

1. I have reviewed this Quarterly Report on Form 10-Q of Outset Medical, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report.

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

   (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our

supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) designated such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Verified Shareholder Derivative Complaint

94.    The Company filed signed SOX Certifications with all of its quarterly reports filed on Form 10-Q and annual reports filed on Form 10-K with the SEC during the Relevant Period. Defendant Trigg signed all SOX Certifications during the Relevant Period. Defendant Chambers signed SOX Certifications from the beginning of the Relevant Period until May 5, 2021. Defendant Ahmed signed all SOX Certifications from August 5, 2021 until the end of the Relevant Period.

### March 9, 2021 Press Release

95.    On March 9, 2021, Outset published a press release announcing its financial results for the fourth quarter and full 2020 Fiscal Year. The press release represented that the Company had "[r]ecorded net revenue of $17.2 million in the fourth quarter and $49.9 million for the full year of 2020, representing 143% and 231% increases respectively, over the corresponding periods of 2019." In addition, the press release quoted Defendant Trigg as stating that "[i]n the fourth quarter our team continued to outperform while building a solid foundation for growth through 2021 and beyond."

### May 5, 2021 Press Release

96.    On May 5, 2021, Outset published a press release announcing its financial results for the first quarter of the 2021 Fiscal Year. The press release represented that the Company had "[r]ecorded net revenue of $22.9 million in the first quarter of 2021, a 219% increase compared to $7.2 million in the first quarter of 2020." In addition, the press release quoted Defendant Trigg as stating that "[o]ur first quarter was marked by strong revenue performance, continued operational execution, and substantial progress across our strategic initiatives, . . . Demand for Tablo is both increasing and extending beyond the acute and subacute care settings, with a growing number of customers preparing for home care programs. With strong interest in Tablo, a robust backlog and clear visibility on the timing of console placements, we are confident in our positioning for consistent strong performance in 2021 and beyond."

### August 5, 2021 Press Release

97.     On August 5, 2021, Outset published a press release announcing its financial results for the second quarter of the 2021 Fiscal Year. The press release represented that the Company had "[r]ecorded net revenue of $25.2 million in the second quarter of 2021, a 115% increase compared to $11.7 million in the second quarter of 2020." In addition, the press release quoted Defendant Trigg as stating: "In the first half of 2021, we delivered best-in-class revenue growth and steady gross margin improvement driven by a team that is dedicated to, and united around, transforming the dialysis experience for patients and providers, … With new home console bookings up substantially in the second quarter, and both current and new customers purchasing Tablo for acute use, our integrated commercial strategy is working as expected. We remain confident in our ability to execute on each of our key strategic initiatives for 2021 and in our long-term growth prospects."

### *November 3, 2021 Press Release*

98.     On November 3, 2021, Outset published a press release announcing its financial results for the third quarter of the 2021 Fiscal Year. The press release represented that the Company had "[r]ecorded net revenue of $26.3 million in the third quarter of 2021, a 91.3% increase compared to $13.8 million in the third quarter of 2020." In addition, the press release quoted Defendant Trigg as stating: "Our strong third quarter performance further reinforces our confidence in our business and in our expectations for growth."

### *November 7, 2021 ESG Report*

99.     In Outset's 2021 ESG Report dated November 7, 2021, Outset stated:

Outset has adopted a promotional material procedure to define acceptable and unacceptable advertising, sales support, training, and other promotional practices for Outset medical devices in the United States. Included in this procedure is Outset's policy that all claims with respect to Outset products must be consistent with approved labeling, with the data submitted to the FDA to obtain 510(k) clearance and/or substantiated with appropriate evidence (*i.e.*, instructions-for-use, verification and validation testing, clinical study report, or any other report requiring a similar rigorous process of review and approval). In addition, without exception, promotional material may be neither false nor misleading (either in terms of a specific product claim or the overall net impression conveyed by the promotional material) and must

comply with all specific conditions of approval for the product being promoted. Furthermore, promotional materials for a cleared or approved product may not promote, discuss, or refer to uncleared, unapproved, or off-label use.

### February 16, 2022 Press Release

100.  On February 16, 2022, Outset published a press release announcing its financial results for the fourth quarter of the 2021 Fiscal Year. The press release represented that the Company had "[r]ecorded net revenue of $28.2 million in the fourth quarter of 2021, a 63.2% increase compared to $17.2 million in the fourth quarter of 2020, and $102.6 million for the full year of 2021, representing an increase of 105.5% compared to $49.9 million for 2020." In addition, the press release quoted Defendant Trigg as stating: "Our entire team contributed to an exceptional 2021, driving record revenue growth, meaningful progress toward our long-term gross margin goal and excellent visibility into 2022 . . . Our established relationships with 7 of the 8 largest national health systems and one-third of the largest 100 regional health systems puts us in a strong position for growth this year in both the acute and home settings."

### 2022 Proxy Statement

101.  On April 14, 2022, Outset filed a Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Trigg, Grossman, Hackett, Hinrichs, Saia, Szyman, and Drexler solicited the 2022 Proxy Statement, which contained material misstatements and omissions.

102.  The 2022 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Grossman and Hackett to the Board; and (2) ratify the appointment of KPMG LLP ("KPMG") as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

103.  Regarding the "Role of our Board in Risk Oversight," the 2022 Proxy Statement stated the following:

> One of the key functions of our Board is informed oversight of our risk management process. Our Board's role in risk oversight is consistent with our

leadership structure, with management having day-to-day responsibility for assessing and managing our risk exposure and our Board actively overseeing management of our risks – both at the Board and committee level. The risk oversight process includes receiving regular reports from committees and management to enable our Board to understand our risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including operations, information technology (including cybersecurity and data privacy), finance, legal, regulatory, strategic and reputational risk. Our Board focuses on the overall risks affecting us, and each of its standing committees has been delegated responsibility for oversight of specific risks that fall within its areas of responsibility. For example:

•Our Audit Committee is responsible for overseeing our major financial, legal and regulatory risk exposures, which spans a variety of areas including litigation, regulatory compliance, financial reporting and insurance, as well as data privacy, cybersecurity and other information technology risks. Our Audit Committee also oversees the steps management has taken to monitor and control such exposures, including guidelines and policies for assessing and managing risk and related compliance efforts.

•Our Nominating and Corporate Governance Committee oversees the management of risks associated with our overall compliance and corporate governance practices and the independence and composition of our Board, including monitoring the effectiveness of our corporate governance guidelines and other policies such as our code of conduct and overseeing our environmental and sustainability efforts and progress and associated risks.

•Our Compensation Committee regularly assesses risks arising from our compensation plans, policies and programs, including whether any such plans encourage excessive or inappropriate risk-taking.

While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the full Board is regularly informed through committee reports about such risks.

104.    Regarding the Code of Conduct, the 2022 Proxy Statement stated the following:

We have adopted a code of conduct applicable to our employees, officers and directors, including our principal executive, financial and accounting officers and all persons performing similar functions. A copy of our code of conduct

is available on our corporate website at www.outsetmedical.com in the Investors section under "Corporate Governance." We intend to post any required disclosures regarding an amendment to, or waiver from, a provision of our code of conduct on the same website. Reference to our website does not constitute incorporation by reference of the information contained at or accessible through our website into this proxy statement.

105.    Defendants Trigg, Grossman, Hackett, Hinrichs, Saia, Szyman, and Drexler caused the 2022 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) for market authorization of TabloCart, the Company was required to receive prior 510(k) clearance; (2) Outset had not obtained the required FDA clearance to market and sell the TabloCart; (3) based on the foregoing, the Company would be forced to stop shipment of the TabloCart; (4) the Company had falsely promoted CRRT as a modality within the FDA-approved indications for the Tablo, when in reality it had not been approved for this purpose; (5) the Company lacked the sales team and process to execute on the ramp of Tablo sales; (6) Outset's internal controls were inadequate and led to, *inter alia*, the improper marketing of Tablo and TabloCart; (7) the Company's reports and financial statements did not fairly present in all material respects: (a) Outset's financial condition, including its reliance on improper marketing, and (b) the fact that the Company's revenue and growth reported therein was the result of undisclosed, illicit, and unsustainable improper marketing; and (8) due to the foregoing, Outset's revenue growth would be adversely impacted. As a result of the foregoing, Outset's public statements were materially false and misleading at all relevant times.

106.    The 2022 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

107.   As a result of Defendants Trigg, Grossman, Hackett, Hinrichs, Saia, Szyman, and Drexler causing the 2022 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Grossman and Hackett to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the appointment of KPMG as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

### *May 4, 2022 Press Release*

108.   On May 4, 2022, Outset published a press release announcing its financial results for the first quarter of the 2022 Fiscal Year. The press release represented that the Company had "[r]ecorded net revenue of $30.6 million in the first quarter of 2022, a 33.3% increase compared to $22.9 million in the first quarter of 2021 and an 8.5% increase compared to $28.2 million in the fourth quarter of 2021." In addition, the press release quoted Defendant Trigg as stating: "The first quarter of 2022 was marked by strong revenue growth and gross margin expansion, which resulted from the momentum we see among both acute care customers and providers expanding access to Tablo at Home, . . . As interest for Tablo accelerates across all market segments, we continued to expand gross margins, invest in innovation, and deliver consistent and predictable financial and operational results, increasing our confidence for sustained strong performance through 2022 and beyond."

### *August 1, 2022 Press Release*

109.   On August 1, 2022, Outset published a press release announcing its financial results for the second quarter of the 2022 Fiscal Year ended June 30, 2022 ("2Q22"). The press release represented that "[r]evenue for the second quarter totaled $25.1 million, in line with guidance provided on June 13, 2022." In addition, the press release quoted Defendant Trigg, who stated that "[a]s we look to the second half of the year, we see no change in underlying demand for Tablo."

110.    The press release also disclosed that Outset had resumed shipment of Tablo Systems for home use following the FDA's approval of its 510(k) submission. In relevant part, the press release stated:

> Outset Medical, Inc. (Nasdaq: OM) ("Outset" or the "Company"), a medical technology company pioneering a first-of-its-kind technology to reduce the cost and complexity of dialysis, ***today announced clearance by the Food and Drug Administration of its previously disclosed 510(k) submission and resumption of Tablo® Hemodialysis System shipments for home use.***

> The Company also reported financial results for the second quarter ended June 30, 2022 and provided financial guidance for 2022. Revenue for the second quarter totaled $25.1 million, in line with guidance provided on June 13, 2022. Gross margin for the second quarter was 15.1%, compared to 4.2% in the second quarter of 2021 and 14.5% in the first quarter of 2022.

> "We are pleased to begin supporting new patients in the home again and helping them achieve autonomy and control over where and when they dialyze," said Leslie Trigg, Chair and Chief Executive Officer. "As we look to the second half of the year, we see no change in underlying demand for Tablo. ***However, we have reflected in our guidance the staffing and inflationary pressures our provider customers are facing, as well as the work we need to do to regain commercial momentum following release of the Tablo ship hold."***

***August 2, 2022 Form 10-Q***

111.    On August 2, 2022, Outset filed its quarterly report on Form 10-Q with the SEC for 2Q22 (the "2Q22 10-Q"), wherein the Company affirmed its previously reported financial results. With respect to Outset's sales practices and FDA approval, the 2Q22 10-Q stated the following, in relevant part:

> ***Tablo is cleared by the FDA for use in the hospital, clinic, or home setting.***
> ***

> ***In late July 2022, the FDA cleared our 510(k) application of Tablo for patient use in the home and we have resumed marketing and shipping Tablo for home use.***

*Driving adoption of Tablo in the acute care setting has been our primary focus to date.* We have invested in growing our economic and clinical evidence, built a veteran sales and clinical support team with significant expertise, and implemented a comprehensive training and customer experience program. Our experience in the acute care market has demonstrated Tablo's clinical flexibility and operational versatility, while also delivering meaningful cost savings to the providers. We plan to continue leveraging our commercial infrastructure to broaden our installed base in the acute care market as well as driving utilization and fleet expansion with our existing customers.

### November 8, 2022 Press Release

112.    On November 8, 2022, Outset published a press release reporting its financial results for the third quarter of the 2022 Fiscal Year ended September 30, 2022 ("3Q22"). In relevant part, the press release stated:

• *Recorded net revenue of $27.8 million in the third quarter of 2022*, a 5.5% increase compared to $26.3 million in the third quarter of 2021 and a 10.8% increase compared to $25.1 million in the second quarter of 2022

• *Achieved gross margin for the third quarter of 2022 of 15.6%*, compared to 11.2% in the third quarter of 2021 and 15.1% in the second quarter of 2022

• *Resumed shipments to new home patients, and grew the Tablo home patient base beyond initial expectations for the third quarter*

• Awarded five-year contract by the Department of Veterans Affairs, enabling Tablo to be sold into the 106 VA hospitals across the U.S. as well as into home settings

* * *

**Full Year 2022 Financial Guidance**

Outset now *projects revenue for 2022 of $111 million to $113 million*, which represents 8% to 10% growth over 2021. This updated guidance compares to prior 2022 guidance of $105 million to $110 million.

113.    The press release also quoted Defendant Trigg, who stated: "Our third quarter results reflect the value Tablo is delivering in both the acute and home settings, with console shipments exceeding our initial expectations . . . we believe our continued

expansion in the acute setting and our strong start to rebuilding the home patient pipeline reflects patient preference for Tablo and strong demand across end markets."

114.   The same day, the Company hosted an earnings call with analysts and investors to discuss its 3Q22 financial results. During the call, Defendant Trigg announced that the Company was adding TabloCart to its line of products, stating:

> To that end, we are pleased to introduce TabloCart, which is a new accessory for Tablo. TabloCart provides additional maneuverability around the hospital and incremental pre-filtration capabilities for sites that suffer from water quality that is far worse than the national drinking water standards. TabloCart will be sold separately at an expected margin accretive ASP. We closed Q3 exceeding our internal projections for TabloCart orders indicating strong early demand for this innovative accessory.
>
> In summary, our strong Q3 was driven by significant expansion in the acute setting and a home pipeline that is rebuilding ahead of expectations. It is clear to us that Tablo remains a highly differentiated solution in one of the largest, most expensive recession proof areas of healthcare. Our performance reflects the truly incredible Outset team who I would like to thank for their courage, commitment, and conviction in all they do every day to advance our mission.

### November 9, 2022 Form 10-Q

115.   On November 9, 2022, Outset filed its quarterly report on Form 10-Q with the SEC for 3Q22 (the "3Q22 10-Q"), wherein it affirmed the previously reported financial results. With respect to Outset's sales practices and FDA approval, the 3Q22 10-Q stated the following, in relevant part:

> **Tablo is cleared by the FDA for use in the hospital, clinic, or home setting.** In May 2022, we implemented a shipment hold on the distribution and marketing of Tablo for use in the home environment pending the FDA's review and clearance of a 510(k) application we submitted for changes made since the device's original March 2020 clearance.
>
> ***
>
> **In late July 2022, the FDA cleared our 510(k) application of Tablo for patient use in the home and we resumed marketing and shipping Tablo for home use.**
>
> **Driving adoption of Tablo in the acute care setting has been our primary**

*focus to date.* We have invested in growing our economic and clinical evidence, **built a veteran sales and clinical support team with significant expertise, and implemented a comprehensive training and customer experience program.**

### January 9, 2023 Press Release

116.   On January 9, 2023, Outset published a press release announcing its preliminary financial results for the fourth quarter ("4Q22") and full 2022 Fiscal Year and the Company's guidance for the 2023 Fiscal Year. In relevant part, the press release stated:

• Revenue in the fourth quarter is expected to be approximately ***$31.5 million, a 13% increase compared to $27.8 million in the third quarter of 2022***

• ***Revenue for 2022 is expected to be approximately $115 million, a 12% increase compared to $102.6 million in 2021***

• Period-end installed base increased 54% year-over-year to approximately 4,000 Tablo® Hemodialysis Systems, including 3,200 with acute- and sub-acute care providers and a more than doubling of units with home providers to nearly 800

* * *

Outset **expects 2023 revenue to be between $140 million to $150 million, growing approximately 22% to 30% over expected revenue for 2022.** Non-GAAP gross margin is expected to expand to approximately 20% for the full year 2023 and exit the year in the mid-20% range for the fourth quarter of 2023.

### February 13, 2023 Press Release

117.   On February 13, 2023, Outset published a press release announcing its financial results for 4Q22 and the full 2022 Fiscal Year. In relevant part, the press release stated:

• ***Recorded net revenue of $32.0 million in the fourth quarter***, a 15.3% increase compared to $27.8 million in the third quarter, and a 14.0% increase compared to $28.2 million in the fourth quarter of 2021. Revenue for the full year was $115.4 million, an increase of 12.4% compared to $102.6 million in 2021

• ***Achieved gross margin for the fourth quarter of 16.5%*** (17.1% on a non-GAAP basis), compared to 11.8% (12.0% on a non-GAAP basis) in the fourth quarter of 2021. Gross margin for the full year was 15.5% (16.1% on a non-GAAP basis), an increase of more than 800 basis points over 2021

\* \* \*

**Full Year 2023 Financial Guidance**

Outset reaffirmed its previously provided ***guidance for 2023, including revenue of $140 million to $150 million***, growing approximately 22% to 30% over 2022, and non-GAAP ***gross margin of approximately 20% for 2023***, exiting the year in the mid-20% range for the fourth quarter.

***February 13, 2023 Form 10-K***

118.   Also on February 13, 2023, Outset filed its annual report on Form 10-K with the SEC for the full 2022 Fiscal Year (the "2022 10-K") wherein it affirmed the previously reported financial results. Defendants Trigg, Ahmed, Grossman, Drexler, Hackett, Hinrichs, Jones, Saia, and Szyman signed the 2022 10-K. With respect to TabloCart and Outset's sales practices, the 2022 10-K stated the following, in relevant part:

***Tablo is an FDA-cleared single enterprise solution for hemodialysis, comprised of a compact console with integrated water purification***, on-demand dialysate production and advanced software and connectivity capabilities.

\* \* \*

***The Tablo system is comprised of the following components***:

\* \* \*

We recently introduced ***TabloCart***, a non-medical accessory for the Tablo Hemodialysis System that provides added maneuverability and optional prefiltration storage.

\* \* \*

Driving adoption of Tablo in the acute care setting has been our primary focus to date. We have invested in growing our economic and clinical evidence, ***built a veteran sales and clinical support team with significant expertise, and implemented a comprehensive training and customer experience program.***

\* \* \*

We sell our solution through our direct sales organization, which covers most major metropolitan markets in the United States. ***Our sales organization is comprised of our capital sales team, responsible for generating new***

***customer demand for Tablo, and our clinical sales team, responsible for driving utilization and fleet expansion of Tablo consoles at existing customer sites.***

\* \* \*

We ***believe the ability to leverage one team to serve both markets will result in significant productivity and cost optimization as we continue to scale our business.***

***February 13, 2023***

119.   Later on February 13, 2023, the Company hosted an earnings call with analysts and investors to discuss its 4Q22 and full 2022 Fiscal Year financial results. During the call, Defendant Trigg stated:

> From a product innovation perspective, last quarter was our first full quarter in market with TabloCart, a new accessory that provides additional maneuverability around the hospital and incremental pre-filtration capabilities for sites with water quality that is far worse than the national drinking water standards. As a reminder, TabloCart is sold separately at a gross margin accretive ASP. Since its launch in Q3, we've been pleased with the strong demand and positive reaction from customers.

120.   Also during the call, Defendant Ahmed stated:

> Our fourth quarter revenue increased approximately 15.3% sequentially and 13.7% year-over-year to $32 million with a year-over-year change driven primarily by higher consumables revenue and higher service and other revenue. This uptick in recurring revenue is one of the benefits of our expanded installed base and continues to be one of the key drivers of gross margin expansion.
>
> Product revenue was up 21.3% from the prior quarter and increased 11.5% year-over-year to $26.4 million. Console revenue grew 22.8% from the third quarter and increased by 1.5% year-over-year to $18.4 million. We saw console ASPs increase again year-over-year, driven primarily by the ongoing demand for Tablo XT and by demand TabloCart, our new accessory launched in the fourth quarter of 2022.
>
> \* \* \*
>
> [W]e have absolutely seen ASP increases from the XT attach, which is again adding value to our customers instead of monetizing that value, which we like. We've also seen TabloCart be a big driver or be a driver rather of ASP sort of lift in the quarter here and are really pleased with the performance there.

The one thing, we have also talked a lot about the fact that we haven't had to discount very heavily in our past, which we view as again, a testament to Tablo's economic value proposition. So pricing, we have no complaints about pricing and pricing is favorable, works favorably for us.

### 2023 Proxy Statement

121.  On April 13, 2023, Outset filed the 2023 Proxy Statement with the SEC. Defendants Trigg, Grossman, Hackett, Hinrichs, Jones, Saia, Szyman, and Drexler solicited the 2023 Proxy Statement, which contained material misstatements and omissions.

122.  The 2023 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Hinrichs, Saia, and Szyman to the Board; and (2) ratify the appointment of KPMG as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

123.  Regarding the "Role of our Board in Risk Oversight," the 2023 Proxy Statement stated the following:

> One of the key functions of our Board is informed oversight of our risk management process. Our Board's role in risk oversight is consistent with our leadership structure, with management having day-to-day responsibility for assessing and managing our risk exposure and our Board actively overseeing management of our risks – both at the Board and committee level. The risk oversight process includes receiving regular reports from committees and management to enable our Board to understand our risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including operations, information technology (including cybersecurity and data privacy), finance, legal, regulatory, strategic and reputational risks. Our Board focuses on the overall risks affecting us, and each of its standing committees has been delegated responsibility for oversight of specific risks that fall within its areas of responsibility. For example:
>
> •Our Audit Committee is responsible for overseeing our major financial, legal and regulatory risk exposures, which spans a variety of areas including litigation, regulatory compliance, financial reporting and insurance, as well as data privacy, cybersecurity and other information technology risks. Our Audit Committee also oversees the steps management has taken to monitor and

control such exposures, including guidelines and policies for assessing and managing risk and related compliance efforts.

•Our Nominating and Corporate Governance Committee oversees the management of risks associated with our overall compliance and corporate governance practices and the independence and composition of our Board, including monitoring the effectiveness of our corporate governance guidelines and other policies such as our code of conduct and overseeing our environmental and sustainability efforts and progress and associated risks.

•Our Compensation Committee regularly assesses risks arising from our compensation plans, policies and programs, including whether any such plans encourage excessive or inappropriate risk-taking.

While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the full Board is regularly informed through committee reports about such risks.

124. Regarding the Code of Conduct, the 2023 Proxy Statement stated the following:

We have adopted a code of conduct applicable to our employees, officers and directors, including our principal executive, financial and accounting officers and all persons performing similar functions. A copy of our code of conduct is available on our corporate website at www.outsetmedical.com in the Investors section under "Corporate Governance." We intend to post any required disclosures regarding an amendment to, or waiver from, a provision of our code of conduct on the same website. Reference to our website does not constitute incorporation by reference of the information contained at or accessible through our website into this proxy statement.

125. Defendants Trigg, Grossman, Hackett, Hinrichs, Jones, Saia, Szyman, and Drexler caused the 2023 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) for market authorization of TabloCart, the Company was required to receive prior 510(k) clearance; (2) Outset had not obtained the required FDA clearance to market and sell the TabloCart; (3) based on the foregoing, the Company would be forced to stop shipment of the TabloCart; (4) the Company had falsely promoted CRRT as a modality within the FDA-approved indications for the Tablo, when in reality it had not been approved for this purpose; (5) the Company lacked the sales team and process to

execute on the ramp of Tablo sales; (6) Outset's internal controls were inadequate and led to, *inter alia*, the improper marketing of Tablo and TabloCart; (7) the Company's reports and financial statements did not fairly present in all material respects: (a) Outset's financial condition, including its reliance on improper marketing, and (b) the fact that the Company's revenue and growth reported therein was the result of undisclosed, illicit, and unsustainable improper marketing; and (8) due to the foregoing, Outset's revenue growth would be adversely impacted. As a result of the foregoing, Outset's public statements were materially false and misleading at all relevant times.

126.    The 2023 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2023 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

127.    As a result of Defendants Trigg, Grossman, Hackett, Hinrichs, Jones, Saia, Szyman, and Drexler causing the 2023 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Hinrichs, Saia, and Szyman to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the appointment of KPMG as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

### *May 3, 2023 Press Release*

128.    On May 3, 2023, Outset published a press release announcing its financial results for the first quarter of the 2023 Fiscal Year ("1Q23"). The press release reported Outset's 1Q23 revenue and provided the Company's updated guidance for the 2023 Fiscal Year, stating the following, in relevant part:

• Recorded **net revenue of $33.5 million in the first quarter**, a 9.5% increase compared to $30.6 million in the first quarter of 2022, and a 4.6% increase compared to $32.0 million in the fourth quarter of 2022

• Achieved **gross margin for the first quarter of 19.2%** (20.3% on a non-GAAP basis), compared to 14.5% (14.8% on a non-GAAP basis) in the first quarter of 2022

\* \* \*

**Full Year 2023 Financial Guidance**

Outset now projects **revenue for 2023 to range from $144 million to $150 million**, which represents approximately 25% to 30% growth over the Company's fiscal year 2022 revenue. This updated guidance compares to **prior 2023 revenue guidance of $140 million to $150 million**. In addition, the Company expects **gross margin for the year to be in the low-20% range, up from its prior guidance** of approximately 20%, and exiting the fourth quarter in the mid-20% range.

***May 3, 2023 Earnings Call***

129.   Also on May 3, 2023, the Company hosted an earnings call with analysts and investors to discuss its 1Q23 financial results. During the call, Defendant Trigg stated the following:

Another important element of our commercial strategy is to drive utilization across the installed base, and we were pleased to see positive trends in treatment volume during the quarter, in line with our expectations. We also saw ASPs rise, both on consoles and consumables, which serves as strong validation of Tablo's clinical and economic value proposition versus our competitors. Our ASPs benefited again from better-than-expected uptake of Tablo add-ons, including good early demand for our TabloCart new product accessory.

\* \* \*

From a product innovation standpoint, we are very pleased with demand for TabloCart, a new product accessory we introduced in Q3 of last year that provides additional maneuverability around the hospital, and incremental water prefiltration capabilities. TabloCart is sold separately and is gross margin accretive ASP and is proving to be a valuable solution to many of our acute care customers.

***May 4, 2023 Form 10-Q***

130.   On May 4, 2023, Outset filed its quarterly report on Form 10-Q with the SEC for 1Q23 (the "1Q23 10-Q"), wherein it affirmed the previously reported financial results. With respect to Outset's sales practices, the 1Q23 10-Q stated:

> ***Tablo is cleared by the FDA for use in the hospital, clinic, or home setting.***
>
> \* \* \*
>
> In late July 2022, ***the FDA cleared our 510(k) application of Tablo*** for patient use in the home and we resumed marketing and shipping Tablo for home use.
>
> \* \* \*
>
> We primarily sell our solutions through our direct sales organization, which covers most major metropolitan markets in the United States. ***Our sales organization is comprised of our capital sales team, responsible for generating new customer demand for Tablo, and our clinical sales team, responsible for driving utilization and fleet expansion of Tablo consoles at existing customer sites.***
>
> \* \* \*
>
> We believe the ability to leverage one team to serve both markets will result in significant productivity and cost optimization as we continue to scale our business.

### June 30, 2023 ESG Report

131.   In Outset's 2023 ESG Report, the Company stated the following:

> Outset has adopted an ethical marketing procedure that defines acceptable and unacceptable advertising, sales support, training, and other promotional practices for Outset medical devices in the United States. Included in this procedure is Outset's policy that all claims with respect to Outset products must be consistent with approved labeling, with the data submitted to the FDA to obtain 510(k) clearance and/or substantiated with appropriate evidence (*i.e.*, instructions-for-use, verification and validation testing, clinical study report, or any other report requiring a similar rigorous process of review and approval).
>
> In addition, without exception, promotional material or statements made by Outset sales representatives may not promote, discuss, or refer to uncleared, unapproved, or off-label use. This means that all promotional activities may be neither false nor misleading (either in terms of a specific product claim or the overall net impression conveyed by the promotional material) and must comply with all specific conditions of approval for the product being promoted.

132.    The statements in ¶¶89-100, 108-120, and 128-131 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) for market authorization of TabloCart, the Company was required to receive prior 510(k) clearance; (2) Outset had not obtained the required FDA clearance to market and sell the TabloCart; (3) based on the foregoing, the Company would be forced to stop shipment of the TabloCart; (4) the Company had falsely promoted CRRT as a modality within the FDA-approved indications for the Tablo, when in reality it had not been approved for this purpose; (5) the Company lacked the sales team and process to execute on the ramp of Tablo sales; (6) Outset's internal controls were inadequate and led to, *inter alia*, the improper marketing of Tablo and TabloCart; (7) the Company's reports and financial statements did not fairly present in all material respects: (a) Outset's financial condition, including its reliance on improper marketing, and (b) the fact that the Company's revenue and growth reported therein was the result of undisclosed, illicit, and unsustainable improper marketing; and (8) due to the foregoing, Outset's revenue growth would be adversely impacted. As a result of the foregoing, Outset's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge as the False and Misleading Statements Continue**

*July 7, 2023 Form 8-K*

133.    The truth began to emerge on July 7, 2023 when, after market hours, the Company filed a Form 8-K with the SEC revealing that it had received a Warning Letter from the FDA (the "Warning Letter"). In relevant part, the Form 8-K stated:

On July 6, 2023, Outset Medical, Inc. (the "Company") received a Warning Letter, dated July 5, 2023 (the "Warning Letter"), from the United States Food and Drug Administration (the "FDA").

As previously disclosed by the Company in its Annual Report on Form 10-K filed on February 13, 2023, the FDA issued an FDA Form-483 identifying four inspectional observations resulting from an FDA inspection that concluded on February 10, 2023. The Company provided its response plan to the FDA on March 3, 2023, and has since completed the associated

remediation workstreams to fully address these observations.

The Warning Letter raises two additional observations. The first observation asserts that certain materials reviewed by the FDA and found on the Company's website promote continuous renal replacement therapy (CRRT), a modality outside of the current indications for the Tablo® Hemodialysis System. The Company believes this concern has been effectively addressed through labeling and promotional changes already underway.

The second observation asserts that the TabloCart with Prefiltration (the "TabloCart"), requires prior 510(k) clearance for marketing authorization. TabloCart, an accessory to the Tablo System, launched in the third quarter of 2022 and sales to date have not been material to the Company's financial results. The Company intends to work collaboratively with the FDA to resolve this observation, including potentially submitting a 510(k) on TabloCart.

The Warning Letter does not request the restriction of the manufacture, production or shipment of the Tablo System in the United States nor does it request the withdrawal of the Tablo System from the U.S. marketplace.

The Company intends to fully cooperate with the FDA, including by responding within 15 business days, to expeditiously and completely resolve the Warning Letter. The Company cannot, however, give any assurances that the FDA will be satisfied with the Company's actions taken in response to the matters raised in the Warning Letter. The Company also cannot give any assurances as to the timing of the resolution of such matters.

134.    On this news, the price per share of the Company's common stock fell $1.20, or 5.9%, from a closing price of $20.46 on July 7, 2023 to close at $19.26 per share on July 10, 2023.

135.    Still, despite this partial emergence of the truth, Defendants continued to mislead investors by failing to disclose the full implications of the Warning Letter, including its impact on the Company's financial projections.

### *2024 Proxy Statement*

136.    On April 11, 2024, Outset filed the 2024 Proxy Statement with the SEC. Defendants Trigg, Grossman, Hackett, Hinrichs, Jones, Saia, and Drexler solicited the 2024

Proxy Statement, which contained material misstatements and omissions.

137. The 2024 Proxy Statement solicited shareholders to, *inter alia*: (1) reelect Defendants Drexler, Jones, and Trigg to the Board; and (2) ratify the appointment of KPMG as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

138. Regarding the "Role of our Board in Risk Oversight," the 2024 Proxy Statement stated the following:

> One of the key functions of our Board is informed oversight of our risk management process. Our Board's role in risk oversight is consistent with our leadership structure, with management having day-to-day responsibility for assessing and managing our risk exposure and our Board actively overseeing management of our risks – both at the Board and committee level. The risk oversight process includes receiving regular reports from committees and management to enable our Board to understand our risk identification, risk management and risk mitigation strategies with respect to areas of potential material risk, including operations, information technology (including cybersecurity and data privacy), finance, legal, regulatory, strategic and reputational risks. Our Board focuses on the overall risks affecting us, and each of its standing committees has been delegated responsibility for oversight of specific risks that fall within its areas of responsibility. For example:

> •Our Audit Committee is responsible for overseeing our major financial, legal and regulatory risk exposures, which spans a variety of areas including litigation, regulatory compliance, financial reporting and insurance, as well as data privacy, cybersecurity and other information technology risks. Our Audit Committee also oversees the steps management has taken to monitor and control such exposures, including guidelines and policies for assessing and managing risk and related compliance efforts.

> •Our Nominating and Corporate Governance Committee oversees the management of risks associated with our overall compliance and corporate governance practices and the independence and composition of our Board, including monitoring the effectiveness of our corporate governance guidelines and other policies such as our code of conduct and overseeing our environmental and sustainability efforts and progress and associated risks.

•Our Compensation Committee regularly assesses risks arising from our compensation plans, policies and programs, including whether any such plans encourage excessive or inappropriate risk-taking.

While each committee is responsible for evaluating certain risks and overseeing the management of such risks, the full Board is regularly informed through committee reports about such risks.

139.   Regarding the Code of Conduct, the 2024 Proxy Statement stated the following:

We have adopted a code of conduct applicable to our employees, officers and directors, including our principal executive, financial and accounting officers and all persons performing similar functions. A copy of our code of conduct is available on our corporate website at www.outsetmedical.com in the Investors section under "Corporate Governance." We intend to post any required disclosures regarding an amendment to, or waiver from, a provision of our code of conduct on the same website. Reference to our website does not constitute incorporation by reference of the information contained at or accessible through our website into this proxy statement.

140.   Defendants Trigg, Grossman, Hackett, Hinrichs, Jones, Saia, and Drexler caused the 2024 Proxy Statement to be false and misleading by failing to disclose, *inter alia*, that: (1) for market authorization of TabloCart, the Company was required to receive prior 510(k) clearance; (2) Outset had not obtained the required FDA clearance to market and sell the TabloCart; (3) based on the foregoing, the Company would be forced to stop shipment of the TabloCart; (4) the Company had falsely promoted CRRT as a modality within the FDA-approved indications for the Tablo, when in reality it had not been approved for this purpose; (5) the Company lacked the sales team and process to execute on the ramp of Tablo sales; (6) Outset's internal controls were inadequate and led to, *inter alia*, the improper marketing of Tablo and TabloCart; (7) the Company's reports and financial statements did not fairly present in all material respects: (a) Outset's financial condition, including its reliance on improper marketing, and (b) the fact that the Company's revenue and growth reported therein was the result of undisclosed, illicit, and unsustainable improper marketing; and (8) due to the foregoing, Outset's revenue growth would be

adversely impacted. As a result of the foregoing, Outset's public statements were materially false and misleading at all relevant times.

141. The 2024 Proxy Statement also was false and misleading because it failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2024 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

142. As a result of Defendants Trigg, Grossman, Hackett, Hinrichs, Jones, Saia, and Drexler causing the 2024 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Drexler, Jones, and Trigg to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the appointment of KPMG as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

### *July 18, 2024 FDA Warning Letter*

143. On July 18, 2024, the FDA published the Warning Letter on its website. The Warning Letter stated:

**Unapproved Device Violations**

1. The TabloCart with Prefiltration is adulterated under section 501(f)(1)(B) of the Act, 21 U.S.C. § 351(f)(1)(B), because your firm does not have an approved application for premarket approval (PMA) in effect pursuant to section 515(a) of the Act, 21 U.S.C. § 360e(a), or an approved application for an investigational device exemption under section 520(g) of the Act, 21 U.S.C. § 360j(g). The device is also misbranded under section 502(o) the Act, 21 U.S.C. § 352(o), because your firm did not notify the agency of its intent to introduce the device into commercial distribution, as required by section 510(k) of the Act, 21 U.S.C. § 360(k), and 21 CFR 807.81(a)(3)(i).

You have not submitted any premarket notification to the Agency for the TabloCart with Prefiltration. However, the evidence and marketing materials

reviewed at the inspection and found on your website [www.outsetmedical.com] on March 15, 2023, indicate that the TabloCart with Prefiltration is a device. For example, your materials state that the TabloCart with Prefiltration is used for "prefiltration"; has "[t]hree customizable filter configurations [to] enable added filtration of carbon and sediment, depending on a facility's incoming water quality"; and is intended to be used with your Tablo Hemodialysis System.

It appears that the TabloCart with Prefiltration could be classified under 21 CFR 876.5665 (Water purification system for hemodialysis), a Class II device type subject to premarket notification:

"(a) Identification. A water purification system for hemodialysis is a device that is intended for use with a hemodialysis system and that is intended to remove organic and inorganic substances and microbial contaminants from water used to dilute dialysate concentrate to form dialysate. This generic type of device may include a water softener, sediment filter, carbon filter, and water distillation system."

TabloCart with Prefiltration appears to meet this definition because:

- It is intended to be used with a Hemodialysis System

- It is intended to remove organic and inorganic substances from water used to dilute dialysate concentrate to form dialysate

The TabloCart with Prefiltration is intended to improve the incoming water quality and lower the pressure specifications for the Tablo Hemodialysis System to include water that exceeds (b)(4). Inadequate filtration of lower quality incoming water may result in adverse effects arising from organic and inorganic contaminants that might be found in improperly prepared dialysis fluid. As noted above, your firm is marketing this device without clearance or premarket approval.

For a device requiring premarket approval, the notification required by section 510(k) is deemed satisfied when a PMA is pending before the FDA [21 CFR 807.81(b)]. The kind of information that your firm needs to submit in order to obtain approval or clearance for the devices is described on the Internet at http://www.fda.gov/MedicalDevices/DeviceRegulationandGuidance/Howto MarketYourDevice/default.htm. The FDA will evaluate the information that your firm submits and decide whether the product may be legally marketed.

2. The Tablo Hemodialysis System is adulterated under section 501(f)(1)(B) of the Act, 21 U.S.C. § 351(f)(1)(B), because your firm does not have an approved application for premarket approval (PMA) in effect pursuant to section 515(a) of the Act, 21 U.S.C. § 360e(a), or an approved application for an investigational device exemption under section 520(g) of the Act, 21 U.S.C. § 360j(g). The device is also misbranded under section 502(o) the Act, 21 U.S.C. § 352(o), because your firm did not notify the agency of its intent to introduce the device into commercial distribution, as required by section 510(k) of the Act, 21 U.S.C. § 360(k), and 21 CFR 807.81(a)(3)(i).

You currently have clearance for the Tablo Hemodialysis System under K223248 for the following indications:

"The Tablo Hemodialysis System is indicated for use in patients with acute and/or chronic renal failure, with or without ultrafiltration, in an acute or chronic care facility or in the home. Treatments must be administered under a physician's prescription and observed by a trained individual who is considered competent in the use of the device. Treatment types available include Intermittent Hemodialysis (IHD), Sustained Low Efficiency Dialysis (SLED/ SLEDD), Prolonged Intermittent Renal Replacement Therapy (PIRRT), and Isolated Ultrafiltration."

However, the evidence reviewed at the inspection and marketing materials found on your website [www.outsetmedical.com] on May 11, 2023, show promotion of the Tablo Hemodialysis System for continuous renal replacement therapy (CRRT) treatment. For example, materials on your website state that two large hospitals converted to a program consisting solely of the Tablo Hemodialysis System and state, "This major conversion eliminated the need for several types of dialysis machines for different clinical needs, including intermittent hemodialysis (IHD) in the dialysis unit and continuous renal replacement therapy (CRRT) in critical care." Other materials on your website state that multiple hospitals who had established CRRT treatment programs "converted those CRRT programs over to Tablo with Extended Therapy" and states, "They also replaced their CRRT machines with Tablo with XT…"

We evaluated the FDA databases and did not find documentation that you have a cleared 510(k) or a premarket notification in-house for an Indications for Use that includes CRRT treatment. In addition, we note that during review of K223248, you confirmed that CRRT is distinct from the cleared indications

for use, device specifications, and treatment modalities for the Tablo Hemodialysis System, and that PIRRT transitions to CRRT at (b)(4) of use1. Patients who require CRRT are typically hospitalized with acute illness resulting in acute kidney injury and possible severe hemodynamic instability, and the devices that provide CRRT treatment have unique features to enable continuous treatment (> 24 hours) for this patient population. Systems that cannot safely and reliably perform CRRT raise serious public health concerns when used for CRRT treatment, because failure of dialysis systems performing CRRT may result in fluid and electrolyte imbalances, inadequate ultrafiltration, infection, and patient harm/death. This change represents a significant modification outside the scope of the K223248 clearance that could significantly affect safety or effectiveness, resulting in a new device such that a separate, additional 510(k) premarket notification must be submitted [see 21 CFR 807.81(a)(3)(i)]. Thus, the sale of the Tablo Hemodialysis System for CRRT is unlawful.

### August 2, 2023 Press Release

144.    On August 2, 2023, after the market closed, the Company published a press release in connection with its financial results for the second quarter of the 2023 Fiscal Year ("2Q23"). The press release revealed that the Company had paused the shipment of TabloCart pending the FDA's 510(k) clearance. In addition, Outset stated that, due to the shipment pause, the Company now expected its revenue for 2023 to be at the low end of its previously projected range. In relevant part, Outset stated:

The Company also announced it has paused the shipment of TabloCart with Prefiltration, an accessory for the Tablo System, pending the Food and Drug Administration's clearance of a 510(k) the Company plans to submit later this month.

"Since receiving the Warning Letter on July 6, we have made the decision to file a 510(k) for TabloCart with Prefiltration and pause distribution of the product until a 510(k) clearance has been granted," added Trigg. "As we look ahead to the second half of the year, we expect our strong momentum both in the acute and home end markets to continue to drive the business."

* * *

Outset *reiterated its 2023 revenue guidance range of $144 million to $150 million, and now expects to be at the low end of this range as a result of the shipment pause for TabloCart with Prefiltration.* The Company reaffirmed its gross margin guidance for the year to be in the low-20% range, exiting the

fourth quarter in the mid-20% range.

145.  On this news, the price per share of the Company's common stock fell $1.97, or 10.2%, from a closing price of $19.36 on August 2, 2023 to close at $17.39 per share on August 3, 2023.

***August 3, 2023 Press Release***

146.  On August 3, 2023, Outset filed its quarterly report on Form 10-Q with the SEC for 2Q23 (the "2Q23 10-Q"), wherein it affirmed the previously reported financial results. With respect to Outset's sales practices, the 2Q23 10-Q stated:

> Although we evaluated TabloCart with Prefiltration prior to marketing and distributing the product and concluded that no marketing authorization was necessary, ***we have paused distribution of TabloCart with Prefiltration pending the FDA's review and clearance of the 510(k) application we plan to submit.***
>
> * * *
>
> Driving adoption of Tablo in the acute care setting has been our primary focus to date. ***We have invested in growing our economic and clinical evidence, built a veteran sales and clinical support team with significant expertise, and implemented a comprehensive training and customer experience program.*** Our experience in the acute care market has demonstrated Tablo's clinical flexibility and operational versatility, while also delivering meaningful cost savings to the providers. We plan to continue leveraging our commercial infrastructure to broaden our installed base in the acute care market, as well as driving utilization and fleet expansion with our existing customers.

***October 12, 2023 Press Release***

147.  On October 12, 2023, after the market closed, the Company published a press release reporting its financial results for the third quarter of the 2023 Fiscal Year ("3Q23"). In the press release, Outset stated that preliminary revenue for 3Q23 was $30.4 million and that the Company "now expects revenue for 2023 to be approximately $130 million."

148.  Outset further stated that "[g]rowth in the quarter was dampened by a larger-than-expected impact in the field from the recent FDA warning letter, and early signs of a more cautious outlook on capital spending than we see as a headwind continuing through

the fourth quarter."

149.    In the press release, Outset also disclosed that its revenue growth had been severely affected by the FDA's warning letter. In particular, Outset updated its 2023 revenue guidance, which purportedly reflected that "[g]rowth in the quarter was dampened by a larger-than-expected impact in the field form the recent FDA warning letter." In addition, the press release stated the following, in relevant part:

> ***Preliminary revenue for the third quarter was $30.4 million***, a 9% increase over revenue of $27.8 million in the third quarter of 2022. ***Outset now expects revenue for 2023 to be approximately $130 million. Preliminary gross margin for the third quarter was 23.6%, or 25.6% on a non-GAAP basis***, compared to 16.4% on a non-GAAP basis in the third quarter of 2022. Total cash, including restricted cash, cash equivalents and short-term investments, was $197 million as of Sept. 30, 2023.

> "Growth in the quarter was dampened by a larger-than-expected impact in the field from the recent FDA warning letter, and early signs of a more cautious outlook on capital spending that we see as a headwind continuing through the fourth quarter," said Leslie Trigg, Chair and Chief Executive Officer. "Importantly, we did not see deals fall out of our pipeline and our economic value proposition remains resonant and differentiated. Our confidence around generating sustained long-term growth and reaching profitability remains high."

150.    On this news, the price per share of the Company's common stock fell $3.38, or 49.9%, from a closing price of $6.77 per share on October 12, 2023 to close at $3.39 per share on October 13, 2023.

### November 7, 2023 Press Release and Earnings Call

151.    On November 7, 2023, Outset published a press release announcing its 3Q23 financial results. In relevant part, the press release stated:

> ***Revenue for the third quarter was $30.4 million***, a 9% increase over revenue of $27.8 million in the third quarter of 2022, and gross margin was 23.6%, or 25.6% on a non-GAAP basis, compared to 16.4% on a non-GAAP basis in the third quarter of 2022.
>
> * * *
>
> **Full Year 2023 Financial Guidance**

Outset reiterated its ***2023 revenue guidance of approximately $130 million and its previous gross margin guidance for the year to be in the low-20% range***, exiting the fourth quarter in the mid-20% range.

152.    Later that day, the Company hosted an earnings call with analysts and investors to discuss its 3Q23 results. In relevant part, Outset stated:

[W]e're still facing and would expect to face in Q4 some of the competitive activity around TabloCart not being available by our choice and some competitive noise making around the other aspect of the warning letter around some case studies that were on our website, we feel that we have fully satisfied the FDA's concerns around the website. We feel that we have fully satisfied the FDA's concerns around the website. And, of course, we've filed an 510(k) on TabloCart.

***November 8, 2023 Form 10-Q***

153.    On November 8, 2023, Outset filed its quarterly report on Form 10-Q with the SEC for 3Q23 (the "3Q23 10-Q"), wherein it affirmed the previously reported financial results. In addition, with respect to Outset's sales practices, the 3Q23 10-Q stated:

First, although we evaluated TabloCart with Prefiltration prior to marketing and distributing the product and concluded that ***no marketing authorization was necessary, we paused distribution of TabloCart with Prefiltration pending the FDA's review and clearance of a 510(k) application.***

* * *

We primarily sell our solutions through our direct sales organization, which covers most major metropolitan markets in the United States. ***Our sales organization is comprised of our capital sales team, responsible for generating new customer demand for Tablo, and our clinical sales team, responsible for driving utilization and fleet expansion of Tablo consoles at existing customer sites.*** In addition, our field service team provides maintenance services and product support to Tablo customers. Our field sales and service teams represent 45% of our total full-time employees as of September 30, 2023. The same sales organization and field service team drive Tablo penetration in both the acute and home markets. ***We believe the ability to leverage one team to serve both markets will result in significant productivity and cost optimization as we continue to scale our business.***

154.    On this news, the price per share of the Company's common stock fell $0.62,

or 14.4%, from a closing price of $4.31 per share on November 7, 2023 to close at $3.69 per share on November 8, 2023.

### January 8, 2024 Press Release

155.    On January 8, 2024, Outset published a press release announcing its unaudited revenue for the fourth quarter ("4Q23") and full 2023 Fiscal Year and providing its revenue and gross margin guidance for 2023. The press release reported "***revenue for 2023 to $130 million***, a 13% increase compared to $115 million in 2022." In addition, with respect to the Company's 2024 guidance, the press release stated:

**2024 Guidance**

Outset expects 2024 revenue to be between ***$145 million to $153 million, growing 12% to 18% over unaudited revenue for 2023 based on the assumptions previously disclosed. Non-GAAP gross margin is expected to expand to the low-30% range for the full year 2024*** and exit the year in the mid-30% range for the fourth quarter of 2024.

### February 21, 2024 Press Release

156.    On February 21, 2024, Outset published a press release announcing its financial results for 4Q23 and the full 2023 Fiscal Year. With respect to the Company's financial results and guidance for 2024, the press release stated the following, in relevant part:

• Recorded ***net revenue of $30.5 million*** in the fourth quarter, bringing ***2023 revenue to $130.4 million***, a 13% increase compared to $115.4 million in 2022.

• Increased gross margin in the fourth quarter by nearly 900 basis points from the prior-year period. ***Fourth quarter gross margin reached 25.3%*** (26.7% on a non-GAAP basis) compared to 16.5% (17.1% on a non-GAAP basis) in the fourth quarter of 2022. Gross margin for the full year was 22.2% (23.6% on a non-GAAP basis) compared to 15.5% (16.1% on a non-GAAP basis) in 2022.

\* \* \*

**Full Year 2024 Financial Guidance**

> Outset reaffirmed its previously provided guidance for 2024, including **revenue of $145 million to $153 million, growing 12% to 18% over 2023**, and non-GAAP gross margin in the **low-30% range for 2024**, exiting the year in the mid-30% range for the fourth quarter.

### February 21, 2024 Form 10-K

157.    Also on February 21, 2024, Outset filed its annual report on Form 10-K with the SEC for the 2023 Fiscal Year (the "2023 10-K"), wherein it affirmed the previously reported financial results. The 2023 10-K was signed by Defendants Trigg, Ahmed, Drexler, Grossman, Hackett, Hinrichs, Jones, Saia, and Szyman and contained SOX Certifications signed by Defendants Trigg and Ahmed attesting to its accuracy. In relevant part, the 2023 10-K stated the following:

> Driving adoption of Tablo in the acute setting has been our primary focus since Tablo's clearance by the FDA for use in an acute or chronic care facility in September 2014. **We have invested in growing our economic and clinical evidence, built veteran field service, sales and clinical support teams with significant expertise, and implemented a comprehensive training and customer experience program.** Our experience in the acute market has demonstrated Tablo's clinical flexibility and operational versatility, while also delivering meaningful cost savings to the providers. **We plan to continue leveraging our commercial infrastructure, including our sales, field service and marketing teams, to broaden our installed base in the acute care market**, as well as driving utilization and fleet expansion with our existing customers.
>
> * * *
>
> We primarily sell our solutions through our direct sales organization, which covers most major metropolitan markets in the United States. **Our sales organization is comprised of our capital sales team, responsible for generating new customer demand for Tablo, and our clinical sales team, responsible for driving utilization and fleet expansion of Tablo at existing customer sites.** In addition, our field service team provides maintenance services and product support to our customers. Our field sales and service teams represent 48% of our total full-time employees as of December 31, 2023. The same sales organization and field service team drive Tablo penetration in both the acute and home markets. **We believe the ability to leverage one team to serve both markets will result in significant productivity and cost optimization as we continue to scale our business.**
>
> * * *

If we fail to retain our sales and marketing personnel, fail to increase our sales and marketing capabilities or develop broad awareness of Tablo in a cost-effective manner, we may not be able to generate revenue growth.

We have limited experience marketing and selling Tablo. We currently rely on our direct sales force to sell Tablo in the United States, and any failure to maintain, leverage and optimize our direct sales force will negatively affect our business, financial condition and results of operations. The members of our direct sales force are highly trained and possess substantial technical expertise, which we believe is critical in increasing adoption of Tablo.

158.   In addition, the 2023 10-K purported to warn of risks facing Outset, stating the following, in relevant part:

***If we fail to retain our sales and marketing personnel, fail to increase our sales and marketing capabilities or develop broad awareness of Tablo in a cost-effective manner, we may not be able to generate revenue growth.***

We have limited experience marketing and selling Tablo. We currently rely on our direct sales force to sell Tablo in the United States, and ***any failure to maintain, leverage and optimize our direct sales force will negatively affect our business***, financial condition and results of operations. The members of our direct sales force are highly trained and possess substantial technical expertise, which we believe is critical in increasing adoption of Tablo.

### *May 6, 2024 Press Release*

159.   On May 6, 2024, Outset published a press release announcing that the FDA had granted 510(k) clearance to TabloCart, stating that "***Outset has resumed distribution of TabloCart with prefiltration and has product available to ship to customers in the United States.***"

### *May 8, 2024 Press Release*

160.   On May 8, 2024, Outset published a press release announcing its financial results for the first quarter of the 2024 Fiscal Year ("1Q24"). The press release reported quarterly revenue of $28.2 million, total gross profit of $8.2 million, and a net loss of $39.9 million. In addition, with respect to the recent TabloCart FDA approval, the press release stated the following, in relevant part:

"With **our recent 510(k) clearance for TabloCart with Prefiltration, 12th consecutive quarter of gross margin expansion and strong sales pipeline growth during the quarter, we are well positioned to capitalize on the $11 billion U.S. dialysis market opportunity,"** said Leslie Trigg, Chair and Chief Executive Officer. "Tablo's uniquely compelling value proposition continues to resonate with acute- and home-care providers, with significant new customer wins in both settings during the quarter."

\* \* \*

**Full Year 2024 Financial Guidance**

Outset **reaffirmed its previously provided guidance for 2024 including revenue of $145 million to $153 million, growing 12% to 18% over 2023, and non-GAAP gross margin in the low-30% range for the full year 2024,** exiting the year in the mid-30% range for the fourth quarter.

***May 9, 2024 Form 10-Q***

161.    On May 9, 2024, Outset filed its quarterly report on Form 10-Q with the SEC for 1Q24 (the "1Q24 10-Q"), wherein it affirmed the previously reported financial results. With respect to Outset's sales practices, the 1Q24 10-Q stated the following, in relevant part:

Driving adoption of Tablo in the acute care setting has been our primary focus to date. We have invested in growing our economic and clinical evidence, built a ***veteran sales and clinical support team with significant expertise, and implemented a comprehensive training and customer experience program.*** Our experience in the acute care market has demonstrated Tablo's clinical flexibility and operational versatility, while also delivering meaningful cost savings to the providers. ***We plan to continue leveraging our commercial infrastructure to broaden our installed base in the acute care market, as well as driving utilization and fleet expansion with our existing customers.***

\* \* \*

***We primarily sell our solutions through our direct sales organization***, which covers most major metropolitan markets in the United States. ***Our sales organization is comprised of our capital sales team, responsible for generating new customer demand for Tablo, and our clinical sales team, responsible for driving utilization and fleet expansion of Tablo at existing customer sites.*** In addition, our field service team provides maintenance services and product support to our customers. Our field sales and service teams represent 49% of our total full-time employees as of March 31, 2024. The same sales organization and field service team drive Tablo penetration in

both the acute and home markets. ***We believe the ability to leverage one team to serve both markets will result in significant productivity and cost optimization as we continue to scale our business.***

162.    The statements in ¶¶144, 146-149, 151-153, and 155-161 above were materially false and misleading and failed to disclose, *inter alia*, that: (1) for market authorization of TabloCart, the Company was required to receive prior 510(k) clearance; (2) Outset had not obtained the required FDA clearance to market and sell the TabloCart; (3) based on the foregoing, the Company would be forced to stop shipment of the TabloCart; (4) the Company had falsely promoted CRRT as a modality within the FDA-approved indications for the Tablo, when in reality it had not been approved for this purpose; (5) the Company lacked the sales team and process to execute on the ramp of Tablo sales; (6) Outset's internal controls were inadequate and led to, *inter alia*, the improper marketing of Tablo and TabloCart; (7) the Company's reports and financial statements did not fairly present in all material respects: (a) Outset's financial condition, including its reliance on improper marketing, and (b) the fact that the Company's revenue and growth reported therein was the result of undisclosed, illicit, and unsustainable improper marketing; and (8) due to the foregoing, Outset's revenue growth would be adversely impacted. As a result of the foregoing, Outset's public statements were materially false and misleading at all relevant times.

## THE TRUTH FULLY EMERGES

163.    The truth fully emerged on August 7, 2024 when, after the market closed, the Company issued a press release announcing its financial results for the second quarter of the 2024 Fiscal Year ("2Q24"). The press release revealed that the Company had significantly missed consensus estimates for 2Q24 and that Outset was lowering its full year 2024 outlook, reducing its full year 2024 revenue guidance by $39 million at the midpoint. In addition, the press release stated that Outset would be forced to take "clear steps to improve our execution." In relevant part, the press release stated:

[N]ew console placements were below our expectations and will be ***lower than we originally forecasted for the year. We are taking clear steps to improve our execution*** and grow the business over the long term to bring the benefits of Tablo to even more providers and dialysis patients.

* * *

**Second Quarter 2024 Financial Results**

***Revenue for the second quarter was $27.4 million*** compared to $36.0 million in the second quarter of 2023, driven by a decline in product revenue to $19.2 million. Service and other revenue was $8.2 million, an increase of 21.5% compared to $6.7 million in the second quarter of 2023. Recurring revenue from the sale of Tablo cartridges and service increased by 24% as compared to the prior-year period. ***Total gross profit was $9.8 million***, compared to $7.7 million for the second quarter of 2023. Total gross margin was 35.7%, compared to 21.4% in the second quarter of 2023.

* * *

**Full Year 2024 Financial Guidance**

***Outset now expects 2024 revenue to be approximately $110 million, revised from a prior range of $145 million to $153 million***, and non-GAAP gross margin to be in the low-to-mid 30% range, revised from prior guidance in the low-30% range for 2024 and exiting the year in the mid-30% range for the fourth quarter.

164.   Later that day, Outset hosted an earnings call with analysts and investors to discuss its 2Q24 results. During the call, Defendant Trigg stated that Outset would have to undergo "***sales team and process restructuring***" and would be unable to deliver on a ramp of TabloCart as previously forecast. In particular, Defendant Trigg stated the following, in relevant part:

What we're experiencing is a temporary dislocation of converting the pipeline to revenue on our timeline due to the changes in customer profile and ***process and the improvements needed in our own sales execution.***

* * *

Given the ***depth and breadth of the sales team and process restructuring, we expect it to take several quarters to fully implement and realize the many benefits*** that will come from it. As we look ahead to the second half of the year, we now know ***it will not be possible to execute this transformation given the expected accompanying disruption while simultaneously delivering on the ramp we previously forecasted.*** As a result, we expect the

73

second half of 2024 will look similar to the first half with **_expected revenue for the year of approximately $110 million._**

165.    On this news, the price per share of the Company's common stock fell $2.33, or 68.53%, from a closing price of $3.40 per share on August 7, 2024 to close at $1.07 per share on August 8, 2024.

## **DAMAGES TO OUTSET**

166.    As a direct and proximate result of the Individual Defendants' conduct, Outset has lost and will continue to lose and expend many millions of dollars.

167.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

168.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

169.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

170.    Such expenditures also include costs associated with the Warning Letter and the Company's efforts to remediate the issues discussed therein.

171.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

172.    As a direct and proximate result of the Individual Defendants' conduct, Outset has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and

their misrepresentations.

## DERIVATIVE ALLEGATIONS

173.    Plaintiff brings this action derivatively and for the benefit of Outset to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Outset, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, violations of Section 14(a) of the Exchange Act, as well as for contribution under Sections 10(b) and 21D of the Exchange Act against Defendants Trigg, Ahmed, and Chambers.

174.    Outset is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

175.    Plaintiff is, and has been at all relevant times, a shareholder of Outset. Plaintiff will adequately and fairly represent the interests of Outset in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

176.    Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

177.    A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Outset's Board consisted of the following seven individuals: Defendants Trigg, Drexler, Grossman, Hackett, Jones, and Saia (the "Director-Defendants") and non-party Brent D. Lang (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time this action was filed.

178.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make or cause the Company to make false and misleading statements and omissions of material fact. This renders the

Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

179.   In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Outset to issue materially false and misleading statements. Specifically, the Director-Defendants caused Outset to issue false and misleading statements which were intended to make Outset appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

180.   Additional reasons that demand on Defendant Trigg is futile follow. Defendant Trigg has served as the Company's President, CEO, and as a Company director since November 2014 and as Chair of the Board since February 2022. In addition, the Company provides Defendant Trigg with her principal occupation for which she receives lucrative compensation. Thus, as the Company admits, she is a non-independent director. Defendant Trigg also solicited the false and misleading 2022, 2023, and 2024 Proxy Statements, which led to, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. As the Company's highest officer and Chair of the Board, Defendant Trigg was ultimately responsible for the Company's issuance of false and misleading statements during the Relevant Period, including the false and misleading 2021 10-K, 2022 10-K, 2023 10-K, and all of the false and misleading SOX Certifications, all of which she signed. As the Company's highest officer and Chairman of the Board, she conducted little, if any, oversight of the schemes to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Trigg is named as a defendant in the Securities Class Action.

In addition, her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, also demonstrate her motive in facilitating and participating in the scheme. For these reasons, Defendant Trigg breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

181.  Additional reasons that demand on Defendant Grossman is futile follow. Defendant Grossman has served as the Company's Lead Independent Director since February 2022 and served as Chairman of the Board from April 2014 to February 2022. Defendant Grossman also serves as a member of the Compensation Committee and the Corporate Governance Committee. Defendant Grossman has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Grossman solicited the false and misleading 2022, 2023, and 2024 Proxy Statements, which led to, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Grossman also signed the false and misleading 2020, 2021, 2022, and 2023 10-Ks. In addition, his insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, also demonstrate his motive in facilitating and participating in the scheme. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Grossman breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.  Additional reasons that demand on Defendant Hackett is futile follow. Defendant Hackett has served as a Company director since May 2019. Defendant Hackett also serves as Chair of the Corporate Governance Committee and as a member of the Audit

Committee. Defendant Hackett has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Hackett solicited the false and misleading 2022, 2023, and 2024 Proxy Statements, which led to, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Hackett also signed the false and misleading 2020, 2021, 2022, and 2023 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Hackett breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.    Additional reasons that demand on Defendant Jones is futile follow. Defendant Jones has served as a Company director since April 2022. He also serves as Chair of the Compensation Committee. Defendant Jones has received and continues to receive compensation for his role as a director as described above. In addition, Defendant Jones solicited the false and misleading 2023 and 2024 Proxy Statements, which led to, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Jones also signed the false and misleading 2022 and 2023 10-Ks. As a trusted Company director, he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. For these reasons, Defendant Jones breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.    Additional reasons that demand on Defendant Drexler is futile follow.

Defendant Drexler has served as a Company director since January 2021 and also serves as a member of the Compensation Committee and as Chair of the Corporate Governance Committee. Defendant Drexler has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Drexler solicited the false and misleading 2022, 2023, and 2024 Proxy Statements, which led to, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Drexler also signed the false and misleading 2020, 2021, 2022, and 2023 10-Ks. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Drexler breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

185.    Additional reasons that demand on Defendant Saia is futile follow. Defendant Saia has served as a Company director since March 2021. Defendant Saia also serves as a member of the Audit Committee. Defendant Saia has received and continues to receive compensation for her role as a director as described above. In addition, Defendant Saia solicited the false and misleading 2022, 2023, and 2024 Proxy Statements, which led to, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Defendant Saia also signed the false and misleading 2021, 2022, and 2023 10-Ks. As a trusted Company director, she conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. For these reasons, Defendant Saia breached her fiduciary duties, faces a substantial likelihood of liability, is not independent

or disinterested, and thus demand upon her is futile and, therefore, excused.

186.    Additional reasons that demand on the Board is futile follow.

187.    Defendants Hackett and Saia (collectively, the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

188.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

189.    Outset has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any

lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Outset any part of the damages Outset suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

190. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

191. The acts complained of herein constitute violations of fiduciary duties owed by Outset's officers and directors, and these acts are incapable of ratification.

192. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Outset. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Outset, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and,

1  therefore, excused.

2      193.    If there is no directors' and officers' liability insurance, then the Director-

3  Defendants will not cause Outset to sue the Individual Defendants named herein, since, if

4  they did, they would face a large uninsured individual liability. Accordingly, demand is

5  futile in that event, as well.

6      194.    Thus, for all of the reasons set forth above, all of the Director-Defendants,

7  and, if not all of them, at least four of the Directors, cannot consider a demand with

8  disinterestedness and independence. Consequently, a demand upon the Board is excused

9  as futile.

10                              **FIRST CLAIM**

11  **Against the Individual Defendants for Violations of Section 14(a) of the Exchange**
                                    **Act**

12

13      195.    Plaintiff incorporates by reference and realleges each and every allegation set

14  forth above, as though fully set forth herein.

15      196.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t

16  shall be unlawful for any person, by use of the mails or by any means or instrumentality of

17  interstate commerce or of any facility of a national securities exchange or otherwise, in

18  contravention of such rules and regulations as the [SEC] may prescribe as necessary or

19  appropriate in the public interest or for the protection of investors, to solicit or to permit

20  the use of his name to solicit any proxy or consent or authorization in respect of any security

21  (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C.

22  § 78l]."

23      197.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides

24  that no proxy statement shall contain "any statement which, at the time and in the light of

25  the circumstances under which it is made, is false or misleading with respect to any material

26  fact, or which omits to state any material fact necessary in order to make the statements

27  therein not false or misleading." 17 C.F.R. § 240.14a-9.

28      198.    Under the direction and watch of the Individual Defendants, the 2022, 2023,

and 2024 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*, that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

199.    The Proxy Statements also failed to disclose, *inter alia*, that: (1) for market authorization of TabloCart, the Company was required to receive prior 510(k) clearance; (2) Outset had not obtained the required FDA clearance to market and sell the TabloCart; (3) based on the foregoing, the Company would be forced to stop shipment of the TabloCart; (4) the Company had falsely promoted CRRT as a modality within the FDA-approved indications for the Tablo, when in reality it had not been approved for this purpose; (5) the Company lacked the sales team and process to execute on the ramp of Tablo sales; (6) Outset's internal controls were inadequate and led to, *inter alia*, the improper marketing of Tablo and TabloCart; (7) the Company's reports and financial statements did not fairly present in all material respects: (a) Outset's financial condition, including its reliance on improper marketing, and (b) the fact that the Company's revenue and growth reported therein was the result of undisclosed, illicit, and unsustainable improper marketing; and (8) due to the foregoing, Outset's revenue growth would be adversely impacted. As a result of the foregoing, Outset's public statements were materially false and misleading at all relevant times.

200.    In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to

the reelection of directors to the Board.

201.   As a result of Defendants Trigg, Grossman, Hackett, Hinrichs, Saia, Szyman, and Drexler causing the 2022 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Grossman and Hackett to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the appointment of KPMG as the Company's independent registered public accounting firm for the 2022 Fiscal Year.

202.   As a result of Defendants Trigg, Grossman, Hackett, Hinrichs, Jones, Saia, Szyman, and Drexler causing the 2023 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Hinrichs, Saia, and Szyman to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the appointment of KPMG as the Company's independent registered public accounting firm for the 2023 Fiscal Year.

203.   As a result of Defendants Trigg, Grossman, Hackett, Hinrichs, Jones, Saia, and Drexler causing the 2024 Proxy Statement to be false and misleading, shareholders voted, *inter alia*, to: (1) reelect Defendants Drexler, Jones, and Trigg to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the appointment of KPMG as the Company's independent registered public accounting firm for the 2024 Fiscal Year.

204.   The Company was damaged as a result of the Defendants' material misrepresentations and omissions in the 2022, 2023, and 2024 Proxy Statements.

205.   Plaintiff, on behalf of Outset, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

206.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

207.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Outset's business and

affairs.

208.    Each of the Individual Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

209.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Outset.

210.    In breach of their fiduciary duties owed to Outset, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) for market authorization of TabloCart, the Company was required to receive prior 510(k) clearance; (2) Outset had not obtained the required FDA clearance to market and sell the TabloCart; (3) based on the foregoing, the Company would be forced to stop shipment of the TabloCart; (4) the Company had falsely promoted CRRT as a modality within the FDA-approved indications for the Tablo, when in reality it had not been approved for this purpose; (5) the Company lacked the sales team and process to execute on the ramp of Tablo sales; (6) Outset's internal controls were inadequate and led to, *inter alia*, the improper marketing of Tablo and TabloCart; (7) the Company's reports and financial statements did not fairly present in all material respects: (a) Outset's financial condition, including its reliance on improper marketing, and (b) the fact that the Company's revenue and growth reported therein was the result of undisclosed, illicit, and unsustainable improper marketing; and (8) due to the foregoing, Outset's revenue growth would be adversely impacted. As a result of the foregoing, Outset's public statements were materially false and misleading at all relevant times.

211.    In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact referenced herein, which renders them personally liable

to the Company for breaching their fiduciary duties.

212.   In yet further breach of their fiduciary duties, during the Relevant Period, four of the Individual Defendants engaged in lucrative insider sales while the stock prices were artificially inflated before the fraud was exposed, netting proceeds of over $35.6 million.

213.   Also, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain internal controls.

214.   The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Outset's securities.

215.   The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Outset's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

216.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

217.   As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Outset has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

218.   Plaintiff, on behalf of Outset, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Unjust Enrichment**

219.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

220.   By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Outset.

221.   The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Outset that was tied to the performance or artificially inflated valuation of Outset, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

222.   Plaintiff, as a shareholder and a representative of Outset, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

223.   Plaintiff, on behalf of Outset, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Abuse of Control**

224.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

225.   The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Outset, for which they are legally responsible.

226.   As a direct and proximate result of the Individual Defendants' abuse of control, Outset has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

227.   Plaintiff, on behalf of Outset, has no adequate remedy at law.

### FIFTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

228.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

229.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Outset in a manner consistent with the operations of a publicly held corporation.

230.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Outset has sustained and will continue to sustain significant damages.

231.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

232.   Plaintiff, on behalf of Outset, has no adequate remedy at law.

### SIXTH CLAIM
**Against Individual Defendants for Waste of Corporate Assets**

233.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

234.   The Individual Defendants caused the Company to pay the Individual

Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

235.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Outset to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

236.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

237.    Plaintiff, on behalf of Outset, has no adequate remedy at law.

## SEVENTH CLAIM
### Against Defendants Trigg, Ahmed, and Chambers for Contribution Under Sections 10(b) and 21D of the Exchange Act

238.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

239.    Outset and Defendants Trigg, Ahmed, and Chambers are named as defendants in the Securities Class Actions, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Actions for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Trigg's, Ahmed's, and Chambers's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

240.    Defendants Trigg, Ahmed, and Chambers, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Actions.

241.    Accordingly, Defendants Trigg, Ahmed, and Chambers are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

242.    As such, Outset is entitled to receive all appropriate contribution or indemnification from Defendants Trigg, Ahmed, and Chambers.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Outset, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Outset;

(c)    Determining and awarding to Outset the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Outset and the Individual Defendants to take all necessary actions to reform and improve Outset's corporate governance and internal procedures to comply with applicable laws and to protect Outset and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Outset to nominate at least

four candidates for election to the Board;

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

(e)     Awarding Outset restitution from Individual Defendants, and each of them;

(f)     Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 29, 2024            Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/    Robert C. Moest            .*
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

## VERIFICATION

I, Marie Chappel, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 27 __ day of November, 2024.

DocuSigned by:

*Marie Chappel*

77297E7FDE824CD...

Marie Chappel